JoNes, Chief Judge,
delivered the opinion of the court:
This case involves a contract between the plaintiffs and the defendant for the construction of a paved road at Fairbanks, Alaska. The facts have been set out in detail in our findings and will be referred to only to the extent necessary for an understanding of the issues which gave rise to the suit.
The principal issue has to do with the amount of borrow material which was excavated by the plaintiffs and put in place on the road. The contract provided for payment for the borrow material at $1.29 per cubic yard and the payment for hauling the material beyond a certain distance at a unit price of 32 cents per cubic-yard mile. The borrow material yardage to be paid for was to be measured in its original position in the borrow pit, which yardage was to be computed by the average end area method, and the overhaul item was to be paid upon the measurement of material in its original position times the overhaul distance in miles and fractions thereof. In other words, an important consideration in determining the amout due the plaintiffs was a determination of the amount of borrow material in its original position.
The face of the quarry rose from a flat surface at a steep, thought not vertical, angle. The average end area method contemplated that surveys be made of the vertical profile of the quarry at frequent intervals along its face, both at the beginning and at the end of the quarrying operations. The extent to which the profile upon final survey had receded from its original position would then be the basis for measuring the amount of material that had been removed from the quarry. At or about the time the plaintiffs began work a survey was made of the quarry. After some 30 or 40 percent of the excavation work had been completed, a slide occurred at the quarry in which a large amount of material moved downward and outward toward the base line where the plaintiffs were operating. The amount of material moved was estimated by a witness for the defendant as from 30,000 to 50,000 *439 cubic yards, and by witnesses for the plaintiffs as from 200,000 to 400,000 cubic yards. A fair statement from tlie evidence would be that defendant’s witness was too conservative and the estimates of plaintiffs’ witnesses excessive. Whatever may be the correct amount, when we consider that the total amount of material moved, as computed by plaintiffs, was 99,592 cubic yards and that 34,596 had been removed at the time of the slide, the possible effect of such a slide on the computation of material in place by the average end area method can be seen.[1] Not only did material come into the area from outside for which no cross section had been prepared, hut also certain points on the original survey were wiped out.
After the contract was completed the contracting officer caused a final survey to be made and on a comparison of that survey with the original survey computed the borrow material excavated as 69,349.7 cubic yards. During the course of the contract- plaintiffs had been paid for this item on a truck-measurement basis, on which basis the borrow material removed had been computed at 99,592 cubic yards, that is, some 30,000 more than the contracting officer computed on the average end area method. The plaintiffs took an appeal from that decision of the contracting officer to the Commissioner of Roads for Alaska, the designated representative *440 of the head of the department, who affirmed the decision of the contracting officer. This suit followed.
When this case was tried and when a report thereon was filed by the commissioner, the last word on the question of the finality of the decision of the head of the department had been stated by the Supreme Court in United States v. Wunderlich, 342 U. S. 98, in which the Court said that a decision made by the head of the department under the “Disputes” clause of a government contract was final and conclusive unless fraud on his part was alleged and proved. The commissioner found that fraud, as measured by the formula set out by the Supreme Court in that decision, had not been established by the plaintiffs. However, after the report had been filed, the Congress passed and the President signed Public Law 356, 83d Congress, 2d Session, which provided that the decision of the head of any department or agency in any contractual dispute shall not be final and conclusive where “the same is fradulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.” [68 Stat. 81.]
We are satisfied from the evidence and have found as a fact that the decision of the head of the department was not supported by substantial evidence. In reaching this conclusion we have considered the evidence on both sides in order to determine whether it appears that the evidence in support of the administrative decision can fairly be said to be substantial in the face of opposing evidence. See Willapoint Oysters v. Ewing, 174 F. 2d 676, certiorari denied, 338 U. S. 860. In a recent decision by the Supreme Court, Universal Camera Corp v. National Labor Relations Board, 340 U. S. 474, 487, the Court made the following statement with respect to the rule relating to substantiality of evidence to support an administrative decision:
Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation [Administrative Procedures Act and Taft-IIart-ley Act] definitively precludes such a theory of review *441 and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record.
The fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole.
As we view the evidence, it is difficult to see how it could be said that there was substantial evidence to support the decision made by the contracting officer and the head of the department in the face of the opposing evidence. What these administrative officials tried to do was to compute the amount of borrow material removed by the use of a method which had been made impossible of accurate application because of the slide which had occurred. It is true that the contract provided for the use of this method but only as a means of determining the amount of material removed for which the plaintiffs were to be paid. The real question was how much material had been removed. Not only were some of the original survey elevations wiped out but also substantial amounts of material came from outside into the area where the plaintiffs were working and from which material had been removed. These factors contributed to errors in comparing the original survey with the final survey for the purpose of a comparison of the material removed. Defendant recognized some of these difficulties and undertook through interpolations or estimates to supply the original survey elevations which were wiped out, and otherwise compensate for the changed conditions. That it did not do so in a satisfactory manner is plainly evident from the opposing evidence which was before the administrative officials when the final decision was made and which they contend confirmed the original decision.
In the first place, when the plaintiffs complained of the decision of the contracting officer, the possibility of error was recognized and an effort made to check that computation. The first method used was to have a mass diagram prepared *442 of material in place on the road.[2] Then a computation was prepared which would show the amout of borrow material in place in its original position in the quarry which would be required to produce the material in place on the road as shown by the mass diagram. This computation resulted in a determination of 66,566.5 cubic yards of borrow material as compared with 64,735.9 cubic yards used in the contracting officer’s determination for roadway embankment (69,349.7 less 4,613.8, which represented material rejected in spoils pile at the quarry and overburden). While the amount so computed was not substantially greater than the amount computed by the contracting officer, it failed to take into account, as shown by finding 25, substantial amounts of material which were used and for which the plaintiffs were entitled to be paid. With these omitted amounts added to the 66,566.5 cubic yards which were computed, the amount becomes substantially greater than that allowed in the final determination.
A second check on the accuracy of the average end area method was made while the appeal was pending through what is known as a specific gravity test. By such a test it was expected that a determination could be made of a change in volume from a solid rock condition of the material in the quarry to a disturbed condition of the same material in a truck, that is, a determination of the percentage of swells or voids in the material loaded in a truck as compared with the material in a solid condition in the quarry.[3] In spite of the *443 fact that in making the test a 3-ton truck was used instead of a 6-ton or larger truck of the type in use by the plaintiffs during their operations, and that the allowance for the swell factor was unfavorable to the plaintiffs, a yardage was computed of 76,000 cubic yards instead of 69,349.7 determined by the contracting officer. We are convinced that with the use of a truck of the proper size'and with the swell factor appropriately resolved an even greater disparity would have been shown.
The third type of evidence before the head of the department when the final decision was made was the truck-measurement basis contended for by the plaintiffs. Prior to the commencement of the hauling operation, defendant’s resident engineer and a representative of the plaintiffs measured each of the trucks on the job and calculated the dimensions of their gross load when heaped full. The volume of each truck as measured was reduced by a swell factor to allow for voids in the material in the trucks as compared with the material in its undisturbed state in the quarry. Each load was checked by inspectors of the defendant both upon departure from the borrow pit and on delivery at the road. Monthly progress payments were made to the plaintiffs by the defendant on *444 the basis of these tabulations. The total yardage computed by this method was 99,592 cubic yards. The major objection raised by the defendant to the accuracy of such computation was that sufficient allowance was not made for swells or voids in the material. In our findings we have agreed that some more allowance should be made for voids than was made in that computation but we are satisfied from the evidence that such allowance should be less than that contended for by the defendant and therefore the amount computed on this basis would likewise be substantially more than that allowed by the head of the department.
What we have, therefore, is a situation wherein the head of the department made a determination of an amount of material removed which was substantially less than the amount computed by any one of three other methods. When we consider the inaccuracies which would certainly result from an attempted use of the average end area method under the changed conditions resulting from the slide, it is difficult to see how three other computations, all of which resulted in substantially greater amounts, could be said to give anything approaching a confirmation of the amount determined by the head of the department. The contradictory and conflicting evidence so detracts from the weight of the evidence in support of the decision as to leave it without substantial support. On the contrary we are convinced that the substantial weight of the evidence supports an amount in excess of that allowed by the head of the department. In our findings we have found that 84,471 cubic yards of borrow material were excavated which is 15,121.3 cubic yards more than that allowed by the defendant. Since the contract price was $1.29 per cubic yard for the excavation of this borrow material, the plaintiffs are entitled to recover $19,506.48 on this item.
Since the amount allowable for the overhaul item varies in direct proportion to the volume of borrow material removed, the cubic-yard miles allowable on this item is 267,727.8 instead of 217,032.4, that is, 50,695.4 cubic-yard miles more than allowed by the defendant. At the contract price of 32 cents per cubic-yard mile, this amounts to $16,222.53, which the plaintiffs are entitled to recover on this item.
*445 The other issue in the case involves questions of law and arises out of an entirely different set of facts from those just discussed. One of the items involved in the contract was the paving of the road with asphalt. In order to do this work, the plaintiffs had considered renting or buying an asphalt plant in the State of Washington. The rental cost of such a plant would have been approximately $10,700. After the job got under way, the plaintiffs learned that there was a plant located at Ladd Air Force Base which was under the jurisdiction of one Major Bussell who was responsible for the maintenance of the roads at the Air Force Base. One of the plaintiffs made inquiry of Major Bussell as to whether arrangements could be made for the plaintiffs to use the plant. Major Bussell suggested that certain roads on the base needed seal coating and if plaintiffs would do this work they could use the plant on the road job. After certain negotiations during which Major Bussell represented that he had been given authority to enter into the agreement, the plaintiffs submitted a written proposal which was accepted by Major Bussell as Air Installation Officer, whereby the plaintiffs agreed to seal coat the main paved roads on the base in return for the use of the asphalt plant to produce asphalt for the road job.
Upon the approval of that agreement by Major Bussell, the plaintiffs proceeded to carry out their part of the agreement which they did by seal coating some nine or ten miles of roads in a manner satisfactory to the Air Force Base authorities. The value of such work was in excess of $10,000.
In the meantime, Major Bussell had forwarded to his superior officer copies of the agreement which he had approved for seal coating of the roads in return for the use of the asphalt plant by the plaintiffs. Shortly after the seal-coating job had been completed but prior to the time when the asphalt plant had been delivered to the plaintiffs, Major Bussell’s superior officer advised him that there was no authority for such an agreement and that work thereunder should be stopped immediately. Major Bussell replied that the work had already been completed and urged that since the plaintiffs had carried out their part of the agreement and since the agreement was in the best interests *446 of the Government, the plaintiffs should, be permitted to use the asphalt plant. However, Major Russell’s superior officer refused to change his position. Major Russell advised the plaintiffs of his inability to carry out the agreement but suggested that arrangements be made to have the plant borrowed by the Alaska Road Commission and then rented by the Commission to the plaintiffs. Major Russell stated that if this could be arranged he would arrange for payment for the work which had already been done by the plaintiffs at Ladd Field. As a result the asphalt plant was turned over by Major Russell to the Alaska Road Commission which, in turn, made it available to the plaintiffs at a rental figure of $1.30 per ton. In agreeing orally to that rental figure, the plaintiffs relied upon the assurance previously given by Major Russell that they would be paid for the work which they had already performed at Ladd Field.
The plaintiffs used the asphalt plant in paving the roads under their contract. At or about the time the paving was completed, Major Russell advised the plaintiffs that payment could not be made by the defendant for the seal-coating work which had been performed by them at Ladd Field. Thereupon the plaintiffs refused to sign a change order prepared by the Alaska Road Commission reducing the unit price of asphalt by $1.30 per ton. However, the contracting officer, in the final settlement under the plaintiff’s contract, directed that the change order be considered a written order changing the specifications and that the rental stipulated therein be deemed to be an equitable adjustment of the contract price. Upon completion of the contract, it was determined that 7,820.3 tons of asphalt had been actually used and accordingly $10,166.39 was deducted from payments to the plaintiffs. On appeal to the head of the department, the decision of the contracting officer was affirmed. No amount has been paid to the plaintiffs on account of the work which they did at Ladd Field.
What the plaintiffs are suing for is the amount just referred to which was deducted from amounts otherwise due them under the contract involved in this proceeding. No question is raised by the defendant as to the fact that the *447 plaintiffs performed the services or that the services were worth at least the amount now sued for. The sole defense of the defendant is that since Major Russell was not a contracting officer with full authority to bind the Government in the fullest contractual sense, the plaintiffs cannot recover on this item. Surely, compelling reasons would be required to have any court sanction any such inequitable result and we do not think such reasons exist. Whatever might be said with respect to the lack of authority on the part of Major Russell to enter into a binding contract, it is certainly true that the plaintiffs proceeded in an entirely appropriate and proper manner in entering into the agreement and did so only after they were assured by Major Russell that he had authority to do so. Likewise, Major Russell had also proceeded in good faith in the entire matter and had been assured by Washington that such an arrangement would be satisfactory. The roads that were seal coated were wholly within the base where the contracting officer was located. It seems incredible that he did not know all about the agreement and by his inaction ratify it. Certainly he did not repudiate the agreement, and he did not appear as a witness. The plaintiffs carried out their part of the agreement for which the Government received the benefit. We feel that there then arose an implied contract under which the defendant was obligated to pay the value of the services rendered by the plaintiffs. Recovery is accordingly allowable for this item in the amount deducted under the contract, $10,166.39. Cf. W. H. Armstrong and Company v. United States, 98 C. Cls. 519, 529; Lewis Joseph Stiers, et al. v. United States, 121 C. Cls. 157, 172; and Pacific Maritime Association v. United States, 123 C. Cls. 667, 676.
Judgment will accordingly be entered for $19,506.48 for the material item, $16,222.53 for the overhaul item, and $10,166.39 for the asphalt plant item, making a total of $45,895.40.
It is so ordered.
Laeamoee, Judge/ MaddeN, Judge; Whitaker, Judge; and LittletoN, Judge, concur.
*448 FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Richard H. Akers, and the briefs and argument of counsel, makes findings of fact as follows:
1. At all times material to this proceeding the plaintiff, Russell H. Williams, was engaged in the contracting business in Alaska as an individual under the name of Williams Equipment Company with his principal place of business in Fairbanks, Alaska. For convenience, that plaintiff will sometimes hereinafter be referred to as “Williams.”
At all times material to this proceeding the plaintiff, Reed & Martin, Inc., was an Alaska corporation with its principal place of business in Fairbanks. It was engaged in the contracting business, normally business construction.
2. During the early part of 1950, the plaintiffs entered into a joint venture agreement for the purpose of submitting a bid to the defendant, acting through the Department of the Interior, Alaska Road Commission, for the construction of a highway from Fairbanks to College and a portion of the Steese Highway, a total distance of approximately 5.74 miles. Williams was the manager of the operation and the other plaintiff did not actively participate therein except in connection with the securing of an asphalt mixing plant hereinafter referred to.
3. The plaintiffs were advised on March 16,1950, by John R. Noyes, Commissioner of Roads for Alaska, that their bid in the total amount of $389,713.10 based upon the estimated quantities set out in the invitation for bids and the unit prices bid by them had been accepted, that the formal contract was being prepared for their signatures, and that that letter would constitute notice to proceed within 15 calendar days after its receipt.
4. Under date of March 28,1950, the formal contract covering the work was signed. That contract bore the number l-arc-4263 and was signed on behalf of the defendant by A. F. Ghiglione, Chief Engineer, Alaska Road Commission, as contracting officer. It provided that the plaintiffs would furnish the materials and perform the work for constructing the highway from Fairbanks to College and a portion of the *449 Steese Highway in consideration of payment of the unit prices set forth in the bid schedule in strict accordance with the specifications, schedules, and drawings specifically designated in the contract. The contract further provided that the work was to be commenced within 15 calendar days after receipt by the contractor of notice to proceed and be completed by October 15, 1950, subject to such extensions as might be authorized under the contract. The work was started at or about the time required, namely, about April 4, 1950, and, as will hereinafter appear, was completed September 30,1950, and accepted October 9,1950.
5. The bid schedule, copy of which was annexed to and made part of the contract, read in part as follows:

6. The contract contained, among other provisions, the following:
Aktiole 4. Changed conditions. — Should the contractor encounter, or the Government discover, during the progress of the work, subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided, for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the head of the department or his duly authorized representative, be modified to provide for any increase or decrease ot *450 cost and/or difference in time resulting from, such conditions.
Article 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the contracting officer subject to written appeal by the contractor within 80 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto. In the meantime the contractor shall diligently proceed with the work as directed.
Article 16. Payments to contractors. — (a) Unless otherwise provided in the specifications, partial payments will be made as the work progresses at the end of each calendar month, or as soon thereafter as practicable, on estimates made and approved by the contracting officer. In preparing estimates the material delivered on the site and preparatory work done may be taken into consideration.
* # $ *|4 $
7. Specifications FP-41 issued by the Federal Works Agency, Public Roads Administration, and incorporated in the contract by reference, provided in part as follows:
Item 26. — Borrow
DESCRIPTION
26-1.1 This item shall consist of excavating approved material from borrow pits, when sufficient quantities of suitable material are not available from other excavations, and the disposing of all excavated material, all in accordance with these specifications and in conformity with the lines, grades, and dimensions shown on the plans or as directed by the engineer.
26-1.2 Material to be used as topping for embankments, as a cushion for rock embankments, or for reinforcing unsatisfactory subgrade soil or for backfilling cuts, where excavation below grade is authorized, shall be obtained under this item when satisfactory material for the special purpose is not obtainable from other excavations.
26-1.3 Seleotion oe Sources. — Material for this item shall be obtained under the terms of case 1 and/or case 2 described below.
Case 1. — When case 1 is called for in the bid schedule, the sources of borrow material shall be indicated on the *451 plans and/or designated by tbe engineer, and the contractor shall be relieved of the responsibility of obtaining the right to take the material from such sources.
& * ‡ Hi ‡
MATERIALS
26-2.1 Material for this item shall be material selected by the engineer as meeting specifications for the particular embankment or backfill for which the material is intended. The material shall be obtained from the approved borrow sources.
Method of Measurement
26-4.1 The yardage to be paid for shall be the number of cubic yards of material (including the yardage of overburden stripped from pits) measured in original position and computed by average end area method, excavated and acceptably disposed of in embankment, backfill, or as otherwise ordered, except that when case 2 is called for in the bid schedule, the yardage of overburden stripped from pits (unless used as borrow material) shall not be included in the yardage to be paid for. The measurement shall not include the yardage of any excavation performed prior to the taking of elevations and measurements of the undisturbed ground.
Basis op Payment
26-5.1 The yardage, measured as provided above, shall be paid for at the contract unit price per cubic yard for “Unclassified Excavation for Borrow, Case 1,” or “Unclassified Excavation for Borrow, Case 2,” as the case may be, * * *.
Item 28.- — Special Overhaul op Borrow
(Cubic-yard-mile basis)
Description
28-1.1 This item shall consist of authorized hauling in excess of the free haul distance of any material paid for under BORROW (case 1) and disposed of as required under the various items prescribed for the disposal of such material.
The free haul distance shall be 500 feet or 1,000 feet, whichever is called for in the bid schedule. Only one free haul distance shall be provided in any one contract.
*452 Method of Meashrement
28-4.1 The number of cubic-yard-miles of special overhaul of borrow to be paid for shall be the product of the volume of the overhauled material, measured in. its original position, in cubic yards, by the overhaul distance in miles and fractions thereof. The overhauled material shall be the material comprehended within the terms of 1.1 above and hauled as directed more than the free haul distance (as designated in the bid schedule). The overhaul distance shall be the distance between the centers of volume of the overhauled material in its original position and after placing, less the free haul distance (as designated in the bid schedule).
* # # # ❖
Basis of PavmeNT
28-5.1 The cubic-yard-miles, determined as provided above, shall be paid for at the contract unit price per cubic-yard-mile for “Special Overhaul of Borrow (500 feet free haul)” or “Special Overhaul of Borrow (1,000 feet free haul),” as the case may be, which price and payment shall constitute full compensation for all labor, equipment, tools, and incidentals necessary to complete the item.
Under the general requirements in the same specifications appeared the following provisions:
Art. 7.14 No Waives of Legal Bights. — The Government shall not be precluded or estopped by any measurement, estimate, or certificate made either before or after the completion and acceptance of the work and payment therefor from showing the true amount and character of the work performed and materials furnished by the contractor, nor from showing that any such measurement, estimate, or certificate is untrue or is incorrectly made, nor that the work or materials do not in fact conform to the contract. The Government shall not be precluded or estopped, notwithstanding any such measurement, estimate, or certificate and payment in accordance therewith from recovering from the contractor or his sureties, or both, such damages as it may sustain by reason of his failure to comply with the terms of the contract. Neither the acceptance by the engineer or by his representatives, nor any payment for or acceptance of the whole or any part of the work, nor any extension of time, nor any possession taken by the engineer *453 shall operate as a waiver of any portion of the contract or of any power herein reserved, or of any right to damages. A waiver of any breach of the contract shall not be held to be a waiver of any other or subsequent breach.
8. Special provisions which were also made a part of the contract read as follows:

Control of Material

* • * * * ❖
Materials suitable for Borrow, Item 26 (1) may be obtained from the following source:

Deposit B-l

1.5 Mi. from Sta. 73+00± Steese Highway, via Steese Highway and Lazelle Road.
Deposit A-l is an existing stockpile, therefore, no clearing or stripping will be required.
Deposit B-l is known locally as the Birch Hill Quarry. The Contractor will be required to secure material from a fresh face. The cost of cleaning an approach to the face, and the cost of any necessary clearing and stripping, shall be considered as included in the unit bid price for Item 26 (1), Unclassified for Borrow.
If it becomes necessary to obtain such material from other sources, allowance will be made for actual net increased haul and will be paid for at the unit price set forth for Item 28 (2) Cu. Yd. Mi., Special Overhaul of Borrow, provided that the quantity shall be determined by truck measurement at point of delivery. The distance shall not be subject to freehaul, but shall be the actual mileage of haul occasioned by the changed location of the material sources as compared to the haul which would have been necessary had all the material been acquired at the designated point. No change in the location of the source of the material shall be made without approval in writing by the Engineer, provided that no reduction in the contract unit price shall be made if consideration of the entire contract undertaking should result in a net decrease in haul.
9. The following “general notes” appeared upon sheet 2 of the contract plans for the highway:
1. Alignment and grades are subject to adjustment.
2. Depths of surfacing, base course and borrow are compacted thicknesses.
*454 3. Curves shall be widened and super-elevated as staked by the Engineer.
4. Approaches shall be constructed to all existing side roads with a minimum width for driveways of 12'. Approach fills shall be constructed with Borrow. Surfacing shall consist of 6" of Crushed Gravel Base Course. Pipes shall be installed according to the Pipe List on sheet 3 of these Plans.
5. An extra allowance of 1820 cu. yd. of Excavation and 5500 cu. yd. of Borrow has been included in the Estimate of Quantities to cover possible stripping and backfilling of poor material encountered during construction.
6. Deposits for Borrow, Base and Surfacing are shown on sheet No. 1 and described in the Special Provisions.
On the cross-section for the road an estimated quantity of approximately 51,000 cubic yards of borrow material was shown as required. To that was added the 5,500 cubic yards of borrow set out in note 5 above, and the total amount so arrived at was further increased by a small yardage to make the even figure of 57,000 cubic yards which was shown in the bid schedule as the estimated amount of borrow required for the project. It was also considered that the borrow material under compaction would yield approximately 62,700 cubic yards of embankment. The cross-sections do not show any separate amount computed as required for driveways and intersections. The original survey was deficient in that it had not taken full cognizance of these driveways and intersections.
The pipe list which appeared on sheet 3 of the contract drawings listed 87 different pipe locations, 70 of which required the installation of pipe for the first time, 8 of which required the extension of existing pipe, and 9 of which required the removal of an existing pipe and the placement of a new one. It was estimated that 1,726 linear feet of 15-inch culvert pipe, 30 linear feet of 21-inch culvert pipe, 436 linear feet of 24-inch culvert pipe, and 146 linear feet of 36-inch culvert pipe would be required, of which 30 feet of 21-inch pipe, 14 feet of 24-inch pipe, and 36 feet of 36-inch pipe were for extensions to existing culverts. In carrying out the work, the plaintiffs installed a total of only 69 more linear feet of pipe than were called for on the above pipe list.
*455 10. At the time the contract involved in this proceeding was entered into and carried out, Col. John R. Noyes was Commissioner oí Roads for Alaska. Colonel Noyes was graduated from West Point with a degree of Bachelor of Science in 1923, and from Cornell University with a degree of Civil Engineering in 1926. He has been on active duty in the Army since his graduation from West Point and most of his work has been of an engineering nature. During the period 1926 to 1933, he was assigned as an assistant at the Alaska Road Commission. In 1946 he was placed on an interdepartmental committee dealing with Alaskan affairs which later, in 1948, indirectly led to his appointment as Commissioner of Roads for Alaska.
The contracting officer was Angelo F. Ghiglione. He received a bachelor’s degree from the University of Washington, and a master’s degree from the Massachusetts Institute of Technology — both in civil engineering. Immediately after his graduation he started working permanently for the Alaska Road Commission in 1933 and, except for a period of military service when he was in the Civil Engineering Corps of the Navy from 1941 to 1944, he has been continuously employed by the Alaska Road Commission. He held various positions with the'Alaska Road Commission prior to 1947, in which year he was promoted to assistant chief engineer, and in April 1949 to chief engineer. As chief engineer he became the contracting officer on the contract involved in this proceeding. In 1951 he was made Commissioner of Roads for Alaska.
11. In 1948, the road-building program in Alaska expanded greatly. Prior to 1948 appropriations had not been more than $5,000,000 a year. Commencing in 1948, they were about $25,000,000 a year. This was brought about by the adoption of a program for hard surfacing as well as by the extension of the normal work for new construction and maintenance. The Alaska Road Commission had to be expanded very greatly in order to take care of the work. It utilized the services of the United States Bureau of Public Roads very largely in initiating the program. The United States Bureau of Public Roads prepared specifications and supervised the work in a number of cases. The Alaska Road *456 Commission had been building roads in Alaska since 1905, but not paved roads. Since this work had been carried out by its own hired crews and not by contractors, the experience of the Alaska Road Commission with road contracts of the type involved in this proceeding was somewhat limited.
The contract involved in this proceeding was the first contract entered into by the Alaska Road Commission for the construction of a hard-surface road in the Fairbanks district which was to be supervised by that Commission. It had entered into two other contracts for hard-surface roads in that area at or about that time but their supervision was by the Bureau of Public Roads. On June 1, 1949, the Alaska Road Commission had executed a contract for the construction of Haynes Highway, a distance of forty miles, and on March 15,1950, had executed a contract for the construction of a road three and one-half miles long at or near Anchorage. Both were hard-surface roads and both were under the complete supervision of the Alaska Road Commission. They were outside the Fairbanks district.
12. At the time the contract was entered into, Colonel Noyes recognized the lack of knowledge and experience of the personnel in the Fairbanks area with contracts of the type about to be carried out. The district engineer, Frank Nash, had grown up with the road work in Alaska but he was not adequately informed on a job of that kind. The assistant district engineer, Milton C. Zimmerman, while a well trained engineer with some years experience in Alaska, was likewise inexperienced on a job of this character. Because of this situation, Colonel Noyes gave more than the usual attention to the job. In addition, the Alaska Road Commission obtained for resident engineer James L. Foster, a competent engineer who had had considerable experience in work of the character involved. Because of the weakness in the district office, Foster was granted more authority than was usually given to a resident engineer in carrying out a job of that kind. Since this was the Commission’s first paved road job in the Fairbanks district and one of their first jobs of that kind which was being carried out without assistance from the United States Bureau of Public Roads, he (Noyes) told Foster he was anxious that a good job be done. Noyes *457 also told Foster that in the event he was unable to secure decisions from Nash, he (Foster) should communicate directly with him (Noyes). On two occasions when Williams toot up matters with Nash, Nash told Williams that Foster was resident engineer and that matters pertaining to the job should be taken up with him. While Foster was under Nash and Zimmerman, most of the decisions which had to be made on the job with respect to carrying out the work were made by Foster without much assistance from them. However, Foster submitted his reports through the district office and conferred with both Nash and Zimmerman from time to time with respect to the manner in which the work should be carried on.
13. The Birch Hill Quarry which was designated in the contract as the source of borrow material was located approximately one and one-half miles east of the eastern terminal of the road construction on the Steese Highway. The length of the face of the quarry on which the plaintiffs were working was about 650 feet and it had a height of 100 to 125 feet. When the plaintiffs started work, the quarry, which was virgin material not previously excavated, lay on about a 45 percent slope, that is, it rose 45 feet for each 100 feet in the face of the slope. In taking material from the quarry, the lay of the material was changed in substantial part to about a 60 percent slope which was the steepest at which the material would remain in place.
The material was a micaceous schist lying in planes four to six inches in width. The deposit was conic in shape and the plaintiffs were working on one of the sloping faces. The material was not a solid wall of rock, but was laminated and had further disintegrated to some extent by the action of the weather upon it. While the evidence does not clearly establish the extent to which voids may have existed in the virgin material before it was disturbed in the plaintiffs’ operation, whatever voids existed, except for broken material on the surface, were smaller in magnitude than the voids in the material after it was removed by the plaintiffs. Small slides, in addition to the major slide hereinafter referred to, occurred from time to time during the operation. The excavation was performed by power shovel which operated from the toe of the *458 slope and loaded the material into trucks. No blasting was required or employed except two small shots to loosen the frozen toe area at the beginning of the operation. The material, loaded as just described, was delivered by the trucks to the road and formed the base course for the road. It was compacted on the road by traffic, including the plaintiffs’ vehicles, moving over it during the period of operations and by the use of a caterpillar tractor.
14. No survey had been made of the part of Birch Hill Quarry where the plaintiffs were required to secure the borrow material prior to the execution of the plaintiffs’ contract. However, since the contract provided that borrow pit material, referred to in the bid schedule as Item 26 (1), and special overhaul of borrow, Item 28 (2), were to be paid for on the basis of the number of cubic yards of material measured in original position in the quarry and computed by the average end area method, the defendant caused a survey to be made of the quarry immediately before the plaintiffs began excavation work. This survey was done in large part by the stadia method by making profiles of the face of the quarry at 25-foot intervals from an established base line 1,000 feet long and parallel with the main slope of the quarry. There was a relatively flat plane at the top and extending back from the quarry, and the profiles just referred to extended back on this plane for distances ranging from 25 to 50 feet. Since the face of the quarry was irregular, inaccuracies could result by the use of the stadia method under such circumstances. However, this method is often used and is usually found reasonably accurate within a margin of error of 5 percent. The chain method of survey which was used to a relatively small extent takes much longer but produces results accurate within a margin of error of 1 percent.
15. It is customary on contracts of this type, where the final quantity is to be established by cross-sections, to make progress payments on the basis of a measurement of trucks, a determination of the load carried by each truck including the heap on the truck and swell in the material, and a count of the number of trips made by each truck. Prior to the commencement of the hauling of borrow from the quarry, defendant’s resident engineer, James T. Foster, and a repre *459 sentative of the plaintiffs measured each of the trucks on the job and calculated the dimensions of their gross load when heaped full. Each of the trucks was numbered and the number painted on its side. The volume of each truck as measured was reduced by a swell factor to allow for voids in the material in the trucks as compared with the material in its undisturbed state in the quarry. A somewhat larger swell factor was used in the smaller trucks because of the greater compaction of the load in a large truck, the greater likelihood of fine material filling voids that might arise during loading, and the fact that the cab on the larger truck held a larger heap at that end. However, that difference in the factor on the smaller trucks became of relative unimportance on the job for the reason that the so-called smaller trucks, seven cubic yards in capacity or less, were used for only a short time during the operations.
The yardage for each truck, adjusted in the manner indicated above to represent yardage in place, was recorded against the number of each truck. Thereafter, throughout the course of the job, a representative of the resident engineer’s office checked each truck that left the borrow pit and listed its number, yardage, and time of departure. Another inspector from the resident engineer’s office on the job noted the time of arrival of each truck, yardage, and the place where delivered. A representative of the plaintiffs also checked yardage and placement of the material on the road. These three reports on yardage were reconciled each day and the resident engineer furnished to the plaintiffs a weekly report on the yardage hauled and the yard mile tabulation based upon the method of calculation just described. Monthly progress payments were made to the plaintiffs on the basis of these tabulations. Likewise the plaintiffs paid their hauling subcontractors on the same basis of calculation of yardage.
16. As shown in finding 14, the base line of the quarry for the survey made by defendant was 1,000 feet long and parallel with the main slope of the quarry. The plaintiffs’ operations in the quarry covered only approximately 650 feet, that is, from station 3+50 to station 10+00. The toe of the slope at station 3 + 50, which was the eastern limit *460 of the plaintiffs’ operations, commenced about 90 feet back from the base line and the toe of the slope at other points between station 3+50 and station 10+00 varied from that distance back of the base line to a close proximity to the base line at stations 8+25 and 8+75 and approximately 50 feet at station 10+00. The power shovel operated at the toe of the slope and toward the steep embankment of the quarry, that is, in a northerly direction. Approximately 92 percent of the material excavated by the plaintiffs during their period of operations came from between stations 6+50 and 9+50.
17. Prior to May 11,1950, the plaintiffs had excavated and moved from the quarry 34,596 cubic yards of material computed on the truck measurement basis heretofore described. On May 11, 1950, a large slide occurred at the site where excavation work was being carried on by the plaintiffs in the quarry — partially burying the shovel and killing the shovel operator. At the time of the slide, the power shovel was operating about in the area of station 7+00 to station 8+50, that is, from 150 to 300 feet from the western end of the borrow area. A large amount of material moved downward and outward toward the base line where the plaintiffs were operating. The slide covered approximately 500 feet along the face of the slope encompassing the area about between stations 4+75 to 10+00. A large amount of material moved as a result of the slide though no accurate determination of the quantity can be made from the evidence in the record nor was any attempt made to determine the extent of the slide when it occurred. A witness for defendant estimated that not more than 30,000 to 50,000 cubic yards of material were involved in the slide, whereas witnesses for the plaintiffs estimated from 200,000 to 400,000 cubic yards. Cracks, fissures, and crevasses were opened up north of the face of the slope and on the slope itself. The biggest crevasse was immediately above the slide area and was about 50 feet long, 10 feet wide, and at least 20 feet deep. At least some of the cracks, fissures or crevasses were outside of the area that had been cross-sectioned. The movement of the material was largely in a vertical direction, that is, *461 toward the base line but there was also some horizontal movement. Most of the movement of the material was within the area which had been cross-sectioned. An indeterminate amount of material came into the cross-sectioned area from without that area. Due to the disturbance and movement of the material, more voids or swell existed in the material after than before the slide occurred.
18. On the afternoon of the day the slide occurred Foster, resident engineer of the defendant, and Williams had a conversation at the quarry with respect to the effect of the slide on the use of the end area or in place method provided in the contract for the payment of borrow material. Williams suggested the impossibility of using the method provided in the contract because of the extent of the slide as compared with the original survey, and Foster indicated that in view of his experience with truck load measurements, which was that they were accurate within 5 percent, the truck load count measurement which was being used would be approximately accurate. There is some evidence that in that conversation Foster told Williams that he (Foster) would take up the matter of the use of the truck load measurement in lieu of the in place method with the officials of the Alaska Road Commission in Juneau and that unless Williams was notified otherwise the truck measurement method would be adopted. However, whatever may have been said in that regard, the matter of the substitution of the truck load measurement for the method provided in the contract was never called to the attention of the contracting officer or any other official of the Alaska Road Commission by Foster or Williams or anyone else prior to the completion of the job. Foster made the following notation with respect to the slide on his weekly report for the week ending May 14,1950:
Job shut down 10:00 A. M. Thursday, May 11, to Monday, May 15. Slide at Birch Hill quarry damaged shovel and killed shovel operator. Operator working too close to face of hill. Accident Report filed by Contractor with office. Copies forwarded to Headquarters.
19. The plaintiffs continued to be paid for the borrow excavation material on the same basis after the slide as before, *462 namely, on the truck measurement heretofore described, and that continued until the excavation work was completed on June 30, 1950, or shortly thereafter. These progress payments were made on the basis of the weekly reports submitted by Resident Engineer Foster. The total for that item, computed by the truck measurement heretofore described and submitted in the voucher for July 31,1950, was 99,592 cubic yards.
20. About the middle of June 1950, the Alaska Road Commission became concerned through the reports of Foster about a probable overrun of borrow material. These reports showed the borrow material quantities running 40,000 to 43,000 in excess of the estimated quantities for that item. This matter was brought to the attention of Colonel Noyes, Commissioner of Roads for Alaska, who was impressed with the seriousness of the overrun situation and discussed it with his engineering staff at that time. As a result, on June 19, 1950, E. J. White, of Juneau, Chief of Surveys for the Alaska Road Commission, sent the following telegram to John Cooley, Assistant to the Chief of Surveys, and located in Fairbanks:
Check College Job eok Overrun ON CoNteact Quantity Pd FosteR Advised on Recent Visit That Total Amount oe Contract Would Not Overrun Pd His May Report Indicates Forty Thousand Over Contract Pd Advise
On June 20, 1950, Cooley replied to White in part as follows:
Reurtel Nineteenth Foster Advises That Overrun Will Be About Forty Three Thousand Pd Reason Due to Line Change Between Station Sixty Eight to Eighty and Mud Boils Station Sixty Two to One Hundred Fourteen Which Were Approved by Noyes Comma Ghiglione Comma Noble See Letter Dated May Ninth to Nash From Noble Pd * * *
What further action, if any, was taken with respect to the prospective overrun does not appear from the evidence. However, as shown above, the defendant continued to make progress payments on account of the unclassified excavation for borrow material in the manner heretofore described.
*463 21. The work on the contract involved in this proceeding was completed on September 30 and formally accepted by the Alaska Road Commission on October 9, 1950. As heretofore shown, the work under Item 26 (1), Unclassified Excavation for Borrow, was completed on or shortly after June 30, 1950.
Foster remained on the job as resident engineer until about September 16,1950, at which time, because of his own illness or illness in his family or some other reason, he returned to California and did not thereafter return to his job in Alaska. At the time he left, the Alaska Road Commission expected that he would return within a few days and his job was not filled on a permanent basis until some months later when it appeared that he would not return to Alaska. No one else connected with the Alaska Road Commission was as familiar with the work as Foster, and his absence from the job made it more difficult for the Alaska Road Commission to prepare the final estimates and ultimately deal with the controversies involved in this proceeding. However, during the period July to September, the greater part of which time Foster was on the job, the survey referred to in finding 22 was made. What connection Foster had with this final survey does not definitely appear, though in his weekly reports for July 23 and August 6, 1950, there are notations to the effect that the survey was being made.
22. Under the average end area method provided in the contract for computing the amount of borrow material removed, it was contemplated that a survey would be made of the quarry after the excavation was completed for comparison with the original survey. The excavation was completed about June 30,1950, and during the period July, August, and September 1950, the office of the Alaska Road Commission at Fairbanks caused such a survey to be made. The same base line was used as in the original survey and cross-sections were prepared, using the same stations as in the original survey, that is, stations 25 feet apart. Since the original survey did not cover the entire area from which material had slid into the quarry, the original profiles were extended by interpolations, under recognized engineering procedure, *464 to cover certain areas not covered by the original survey. The use of interpolations is subject to certain inaccuracies but usually provides a reasonable degree of accuracy.
The interval between the original survey and the final survey as plotted was used as a basis for computing the material removed from the quarry. No allowance was made for swell or voids in the quarry which may have beeen created in the material remaining in the quarry by reason of the slide. That computation showed the total amount of borrow material excavated as 68,888.82 cubic yards and the number of cubic-yard miles of special overhaul for borrow as 202,532. On that basis the final estimate was prepared by the resident engineer and approved by the district office of the Alaska Road Commission. This estimate was a reduction in the borrow material item from 99,592 cubic yards, as reported on the truck measurement basis, to 68,888.32, that is, a reduction of 30,703.68 cubic yards which, at the contract price of $1.29 per cubic yard, amounted to a reduction, in the amount to be paid to the plaintiffs of $39,607.75. Similarly on the overhaul item, it meant a reduction from 311,570 cubic-yard miles to 202,532, that is, a reduction of 109,038, which, at 32 cents yer cubic-yard mile, amounted to a reduction in the amount to be paid to the plaintiffs of $34,892.16.
23. In computing the final yardage of borrow material which had been removed from the quarry by the use of the two surveys, 27 cross-sections taken 25 feet apart were used, that is, from station 3+50 to station 10+00 which was the area where the excavation was carried out. Four of these sections were found wholly negative and six others partly negative. A negative section is one in which the final ground is above the original ground, that is, more material than there was at the start of the excavation. A partly negative section is where some portion of the final ground is above the original ground. The defendant deducted yardage to the extent of the negative and partly negative sections. The following tabulation shows the amount of material computed for each section, including the sections shown as negative or partially negative:

*465

The total amount shown above differs from the final estimate referred to in the previous finding by 461.38 cubic yards which represented overburden removed by the plaintiffs but which the Commission did not at first recognize for pay purposes as borrow material. In the final determination, however, the total of 69,349.70 cubic yards was allowed. It was allocated as follows:
64,735.90 cubic yards to roadway embankment.
4,152.42 cubic yards rejected in spoils pile at quarry.
461.38 cubic yards overburden.
24. Shortly prior to November 25, 1950, the district engineer forwarded to the plaintiffs the final estimate referred to in finding 22, and on November 25, 1950, the plaintiffs wrote the district engineer as follows:
*466 This will acknowledge receipt of your final estimate on the College Road job, Contract No. l-arc-4263. _
_ In checking your quantities shown on the estimate we find that there are great discrepancies between estimate No. 4 and the final quantities.
Since the quantities of previous estimates were determined by load slips, weight slips, cross section and records which were compiled and maintained by the Resident Engineer who furnished the supervision and control on this job', and in view of the discrepancy between the final quantities and those previously approved we cannot accept this estimate without complete substantiating data used in the compilation of your quantities.
It is impossible for us to understand how such a great discrepancy could be possible on a job with competent administration and control.
We hereby request that the Contractor be furnished complete supporting data including copies of field notes on quarry sections, all preliminary and final sections and other supporting data used in determining the final quantities.
25. Because of their dissatisfaction with the foregoing determination by the district engineer, the plaintiffs took the matter up with the contracting officer. Various conferences and discussions were had with the contracting officer and other representatives of the Alaska Road Commission in connection with which, and other conferences after the decision by the contracting officer, the Alaska Road Commission made available to the plaintiffs and to a consulting engineer retained by them all field books, profiles, and engineering data of the Alaska Road Commission having to do with the project. While these discussions were being had, the contracting officer caused the district engineer to prepare a mass diagram of the material in place on the road and compute the quantity of borrow material in place on the road. This computation resulted in a determination of material in place in the roadway of 66,566.5 cubic yards. The computation was made as a check on the reasonable accuracy of the amount of the borrow material which had been previously determined by the average end area method as used for roadway embankment, namely, 64,185.90 cubic yards. It also afforded a basis of comparison with the estimates of borrow material *467 required as set out in finding 9. For such purposes, it failed to take into consideration indeterminate amounts of material as follows:
(a) The road in question was built on a gravel road which had been in existence for many years and which had been reinforced with gravel the preceding year. In that area such roads, when subjected to traffic in the thawing period during the spring, often give way due to frost or mud boils and other soft conditions in the road. The plaintiffs began placing material on the road before it had thawed. When the ground underneath thawed, some of the material placed thereon sank and had to be replaced. In addition mud boils developed from time to time over the road and additional material was required in the places where they occurred. It had been estimated 5,500 cubic yards would be required to replace unsuitable soil. The plaintiffs were authorized to excavate certain areas where the major mud boils occurred. The total area so excavated was 6,952 cubic yards and that area was filled by material from the quarry. Allowing for the expansion of the material, the estimated quantity in place in the quarry of 5,500 cubic yards of borrow material to be used to replace unsuitable soil would not be substantially less than that required to fill the 6,952 cubic yards of excavation. However, a reasonable conclusion from the evidence is that additional borrow material was required on account of mud or frost boils which were not excavated and on account of places where the road sank during the thawing season.
(b) As shown in finding 9, the original survey was deficient in that it had not taken full cognizance of driveways and intersections for which borrow material was required. The plaintiffs performed the work in connection with these driveways and intersections as directed by the resident engineer and in doing so used more borrow material than had been included in the original estimate.
(c) During the course of construction it was found necessary to make a change in the location of the road which made an increase in the estimated quantity of borrow material required of approximately 2,000 cubic yards. An error in chaining occurred in the original survey which also increased the estimated quantity by an indeterminate but *468 smaller amount than that required for the change in location.
(d) An indeterminate amount of borrow material, in addition to the original estimate, was required for a fill at a place on the road known as the Noyes Slough by reason of incomplete cross-sections which were available when the original estimate was made.
26. After the study referred to in the preceding finding had been made, a conference was held in April 1951 at the office of the Alaska Road Commission in Juneau which was attended by representatives of the plaintiffs and of the Alaska Road Commission, and which lasted for two days. Following that conference, the contracting officer allowed a number of the claims which the plaintiffs had submitted, but denied the claims for Item 26 (1) and 28 (2), Unclassified Excavation for Borrow and Overhaul of Borrow Material.
27. The plaintiffs took an appeal from the foregoing decision of the contracting officer to the Commissioner of Roads for Alaska, the designated representative of the head of the department. At the conference in Juneau, referred to in the preceding finding, the suggestion was discussed of having a specific gravity test made of the material in the quarry as a further check on the accuracy of the amount previously determined through the use of the average end area method. By such a test it was expected that a determination could be had of the change in volume from a solid rock condition of the material in the quarry to a disturbed condition of the same material in a truck, that is, a determination of the percentage of swell or voids in the material loaded in a truck as compared with the material in a solid condition in the quarry. Upon or prior to the return of Zimmerman, construction engineer on the project at Juneau and a participant in the conference at Juneau, Noyes, Commissioner of Roads, and Ghiglione, contracting officer, either authorized or instructed Zimmerman to cause a specific gravity test of the kind referred to above to be made. Samples of solid rock material, varying in dimensions from head to fist size, were obtained from two locations in the quarry and the specific gravity of these samples was determined by standard engineering methods. A truck load (using a 3-cubic-yard truck) was taken from each location. The loads were *469 heaped at the quarry. After the trucks were driven to the yard of the Alaska Road Commission in Fairbanks, some two miles from the quarry, the heaped portion of the load was struck off to make a water level and any holes visible were filled by placing material from the quarry therein. The trucks so loaded were then weighed and a determination made of the weight of the material therein. By application of the specific gravity of this material to the weight of a 3-cubic-yard load, it was determined that a 3-cubic-yard truck load contained 33 percent voids. By the application of that percentage of voids to the yardage as determined on the truck measurement basis contended for by the plaintiffs, a calculated quantity of 76,000 cubic yards was determined for the borrow material in place in the quarry which had been removed by the plaintiffs. Such a result was considered by the Alaska Road Commission as tending to support its determination of the borrow material removed as computed by the average end area method.
The plaintiffs did not know that the specific gravity test referred to above was being made and were not given an opportunity to participate therein. No 3-cubic-yard trucks were used by the plaintiffs on the job — the smallest having a capacity of six or seven cubic yards — and these smaller trucks were used for only a short time at the beginning of the job. The trucks used for most of the work had a capacity in excess of seven yards. The representatives of the Alaska Road Commission used the smaller truck because such a truck happened to be working in the quarry at the time, and without any intent to be unfair to the plaintiffs. However, a more accurate determination and tending to be more favorable to the plaintiffs would have resulted by the use of trucks of the sizes which were used in performing the work.
In considering the plaintiffs’ appeal, the Commissioner of Roads made a study of the various items in controversy, including the effect thereon of the specific gravity test referred to above, and under date of June 15, 1951, wrote the plaintiffs allowing some of the claims on appeal. With respect to the items “Unclassified Excavation for Borrow” and “Special Overhaul of Borrow,” he increased slightly the *470 quantities which had been allowed by the contracting officer but otherwise disallowed the claims. On these two items his rulings were as follows:
Item No. 26 (1) Unclassified Excavation for Borrow
The District Engineer has now completed further studies of the Birch Hill Quarry rock. By careful weighing of loaded trucks and laboratory determination of the specific gravity of numerous representative rock samples it has been determined that a truck struck to water-level capacity after a two-mile haul contained 33% voids. In other words, it took only 4 yards of solid rock to fill a 6-yard truck. These tests were made with great care being exercised to obtain typical loadings, excessive oversize was avoided, and normal fines were carefully included. When struck off after a two-mile haul, any open holes in the top of the load were carefully hand filled.
Heaped loads were also carefully weighed. These tests proved that a heaped truck credited, during the course of the work, with a 7-yard load actually contained only 5.33 yards of solid rock. In other words, by actual weight tests it was found that a typical heaped truck contained only 76% of the solid rock that it was or edited with during the truck count tabulations. It is reported by the Contractor that 15% swell factor was used in determining the yardage credited to each truck by the truck count method. Multiplying the 85% credited by the 76% of credited yardage determined by weight measurements gives an actual capacity of 65% of the in place yardage, which closely checks the initial weight determination of voids in a struck load. It therefore appears sound to apply to the truck load credit of 99,962 yards a factor of 76%, which would result in a calculated quantity of 76,000 cubic yards. This is based on careful loading to the ideal capacity as explained above, so is considered a reasonable verification of the 64,736 delivered cubic yards that our engineers have already established from cross sections of the borrow pits and checked against the 66,567 cubic yards found to exit in the embankment.
It is therefore concluded that the truck count method claimed by the contractor is not the most accurate method of determination of the quantities contemplated by the contract, and that the cross sections of the existing and reconstructed surfaces of the borrow pit, as used by the resident engineer, are the most accurate and are *471 equitable and final. In regard to Mr. Ferguson’s brief, it is not agreed that the Government representatives at the Juneau conference accepted the conclusion that the contract method of measurement became impossible as a result of the slide. Neither is it conceded that Mr. Foster “recognized the impossibility of using the contract method of measurement” or at any time intended to rely upon the truck count for final determination of quantities. If so, why did the resident engineer require the continuation of cross sectioning of the quarry in July and August when the slide occurred on May 11 ?
Under Article 6.1, Sources of Material, the Special Provisions state that “the cost of any necessary clearing and stripping shall be considered as included in the unit price bid for Item 26 (1).” The resident engineer therefore rule[d] 461.38 cubic yards of the spoil pile as overburden stripping for which no payment was due. However, Specifications FP-41, in Article 26-4.1 provide for inclusion of the yardage of overburden stripped from borrow pits, and the Special Provisions of this contract failed to modify the provisions of that Article. Whatever the initial intent of Article 6.1 of the Special Provisions, it is not conclusive, and it is therefore concluded that Article 26-4.1 of Specifications FP-41 shall govern, and that the entire 69,349.7 cubic yards calculated as excavated from the Birch Hill Quarry shall be allowed as the final pay quantity under Item 26' (1). This yardage was disposed of by delivering 64,736 cubic yards to the roadway, wasting 4,152.4 cubic yards as rejected material, and removing 436.1 cubic yards of overburden.
* ❖ * * #
Item No. 28 (2) Cu.-Yd.-Mile Special Overhaul of Borrow
This item is, of course, directly proportionate to the quantity of the borrow under Item 26 (1). Since the truck count measurement of the borrow has been found unreliable as to quantity, it must also be determined unreliable as to overhaul. A recheck of the mass diagrams, showing the disposition of the borrow, gives a final quantity on this item of 217,032.4 cubic yard miles.
28. On July 20,1951, the plaintiffs requested a reconsideration of the decision by the Commissioner of Roads and on July 30,1951, the Commissioner of Roads affirmed his prior decision in a letter to counsel for the plaintiffs as follows:
*472 We now have the letter, addressed to us by Mr. Ferguson under date of July 20, protesting the June 15 decision of the Commissioner of Eoads for Alaska.
You refer to quantities supported by “sound engineering practices.” In view of the contract terms we contend that the cross sections of the borrow pit are the only engineering practices that may be relied upon in this case. We believe that accurate results have been obtained from the reconstructed position of that part of the pit which was affected by the slide but had not been initially cross sectioned. As previously explained, we rely upon this cross sectional method of computing the volume of the material in its original position. We have confidence in those quantities because the volume of the embankment, as now in place, strongly supports the calculated excavation quantities and a load weight, specific gravity test gives further confirmation. You contend that the “test referred to in your decision clearly indicates” erroneous calculations. We believe that a carefully loaded and subsequently hand packed test truck would certainly hold more rock than the average of trucks hauling under job conditions. We therefore believe that the factor derived from the load test, as applied to the truck count, gives a very reasonable confirmation of our calculated 64,736 excavated yards when it shows an ideal, hand packed, capacity of 76,000 yards.
You now suggest a compromise. In matters of this nature the contracting officer, or other official of the executive department of the Government, has no authority to compromise. However, what you really offer is not a compromise but the establishment of another method of measurement, or rather the re-examination of one of the methods we have already used as a check. We do not believe that such a re-examination would produce results materially differing from the test made by our forces, which was conscientiously carried out under procedures stipulated by recognized authorities. We therefore see little to be gained by further tests, but certainly have no objection to your client’s making whatever tests he desires.
The June 15, 1951, decision of the authorized representative of the head of the department is therefore reaffirmed and is final.
29. The decision of the contracting officer, which was affirmed on appeal to the Commissioner of Eoads, with respect to the total amount of borrow material excavated *473 and similarly with respect to the overhaul item, was not supported by substantial evidence. When all the evidence is considered, and the different methods of measurement are put together, it is a reasonable conclusion that at least 84,471 cubic yards of borrow material were excavated instead of 69,349.7 cubic yards allowed by the defendant, that is, 15,121.3 cubic yards more than allowed which, at the contract price of $1.29 per cubic yard, amounts to $19,506.48. Since the amount allowable for the overhaul items varied in direct proportion to the volume of borrow material removed, the cubic-yard miles allowable are 267,727.8 instead of 217,032.4; that is, 50,695.4 cubic-yard miles more than allowed by the defendant, which, at the contract price of 32 cents per cubic-yard mile, amounts to $16,222.53.
30. One of the items involved in carrying out the contract involved herein was paving the road with asphalt. To perform that work it was necessary for the plaintiffs to have an asphalt plant. At the time they submitted their bid and entered into the contract, the plaintiffs contemplated renting or buying one of two asphalt plants located in the State of Washington. The rental costs including transportation, erection and dismantling would have been approximately $10,700.
31. After the contract was executed the plaintiffs learned that there was an asphalt plant at Ladd Air Force Base in Fairbanks. In April 1950 a representative of the plaintiffs called upon Maj. Leon Russell, the Air Installation Officer at that place, to determine whether the plaintiffs could rent the asphalt plant located there. Major Russell advised the plaintiff’s representative that the roads on the airfield needed seal coating and that if the plaintiffs would seal coat certain roads on the base, he would allow them to use the asphalt plant in return for such service. On April 8, 1950, the plaintiffs wrote Major Russell, in part, as follows:
We are now deferring our plans for the purchase and shipment of any asphalt equipment for the College Road job which we are under contract to the Alaska Road Commission. As a result of our talk with you concerning this matter, we are sure that an equitable arrangement can be consummated which will definitely work out to the *474 advantage of the Government, and also save our firm considerable capital investment for such a small quantity of asphalt mix required for this job.
32. The representative of the plaintiffs had further conversations with Major Russell and arrived at a mutually agreeable proposal along the line indicated in the preceding' finding. Major Russell said among other things that he would go through channels and find out if he had the authority to enter into such an agreement. About the middle of May 1950, Major Russell advised plaintiffs that he had been granted the authority to make the deal and that plaintiffs should write him a letter setting out the agreement theretofore reached. On May 17, 1950, the plaintiffs wrote the following letter to the Office of the Air Installation Officer, Ladd Air Force Base, for the attention of Major Russell, on which Major Russell indicated his approval as set out below:
Reference is made to our recent conversation regarding the Asphalt Plant. We wish to submit the following agreement for your consideration.
1. The Contractor agrees to accomplish the following work items on Ladd Air Force Base for the Air Installations Office during the 1950 Construction Season:
a. Seal coat the main paved roads which includes approximately nine lineal miles of road. Seal coat to consist of 30# of chips and .25 gal. of asphalt per square yard.
b. Operate and maintain the Asphalt Mixing Plant located in the 500 zone, and produce a maximum of 10,000 tons of asphalt mix. Mix to be delivered to A. I. O. operated trucks at the Asphalt Plant.
2. The Air Installations Officer agrees to furnish the Contractor with the following materials and equipment for prosecution of work items listed above:
a. Asphalt Plant and all allied equipment in operating condition.
b. Foreman for Asphalt Plant who will oversee equipment only.
c. All fuel oil, oils, and grease for A. I. O. owned equipment.
d. Chips and aggregate at bulkhead.
e. All equipment required for applying seal coat with the exception of dump trucks. (The Contractor *475 is to bire a distributor operator specified by the A. I. 0. for operation of the Government owned asphalt distributor.)
3. In return for the work to be accomplished by the Contractor as listed in paragraph #1 above, the Air Installations Officer will permit the Contractor to use the Asphalt Mixing Plant for producing approximately 10,000 tons of mix for the Contractor’s job near Fairbanks, Alaska. At no time will the production of asphalt mix for the Contractor’s requirements be allowed to interfere with production _ of asphalt mix for the A. I. O. requirements, providing the Contractor is given three days advance notice. Submitted:
[s] Russell H. Williams,
Williams Equipment Company.
Reed and Martin, Inc.
A Joint Venture.
Approved:
[s] LeoN Russell,
Air Installation Officer.
33. Major Russell, the Air Installation Officer, had charge of the maintenance of roads, buildings, and facilities of Ladd Air Force Base. He was not, however, a contracting officer.
34. Seal coating referred to in the letter of May 17, 1950, was the application of a surface dressing to an asphalt surface to prevent water from entering into the pores of the asphalt. It is maintenance work which is required to be done at intervals of approximately two years. The plaintiffs did the seal coating called for under the terms of the letter of May 17, 1950, placing a seal coat on some nine or ten miles of roadway at Ladd Field and otherwise fulfilling the terms and conditions set out in that letter. The work was begun about the middle of June 1950 and completed shortly after July 1,1950. The fair value of that work was not less than $10,166.39, the amount deducted from the plaintiffs’ contract price as shown in finding 39.
35. On June 9,1950, Major Russell forwarded copies of the letter of May 17,1950 (referred to in finding 32) to his superior officer. Under date of July 13,1950, Major Russell was advised by radiogram by his superior officer that there was no authority for an agreement of the type set out in the letter of May 17, 1950, and that work thereon should be stopped *476 immediately. On July 18,1950, in response to the foregoing radiogram, Major Russell advised his superior officer that the plaintiffs had already completed their part of the agreement and urged that it was in the best interest of the Government that the agreement be carried out in its entirety. His letter reads in part as follows:
c. Mr. Williams agreed that if the base would furnish the plant, he would do the work, as per the attached agreement.
d. This was believed to be a good proposition whereby the Government would gain considerably by getting a job done at very little cost, by the use of equipment which would otherwise be idle.
e. This Agreement was cleared through Base Legal Department and [w]as signed by the Air Installation Officer and the Contractor.
f. This proposition was presented to Washington and no objections were received, provided certain facts were covered in the Agreement, which are believed to be covered.
g. On 1 June 1950 the Williams Construction Company started the seal coating and completed same. Mr. Williams proceeded with the rest of the bargain and in all ways has carried out his part of the Agreement.
2. It is felt that it is of the best interest to the Government that this agreement be carried out in its entirety, and is considered good business.
On July 18, the Headquarters of the Alaskan Air Command formally advised the Commanding General, Ladd Air Force Base, that such an agreement was unauthorized and that, therefore, favorable consideration could not be given thereto.
36. Shortly after he received the radiogram of July 13, 1950, referred to in the preceding finding, Major Russell advised plaintiffs of his inability to carry out his agreement to deliver the asphalt plant and suggested that arrangements be made to have the plant borrowed by the Alaska Road Commission from Ladd Air Force Base and then rented by the Alaska Road Commission to the plaintiffs. Major Russell stated that if this could be arranged, he would arrange for payment for the work which had already been done by the plaintiffs at Ladd Field.
*477 ■ • 37. After discussions with the plaintiffs, officials of the Alaska Road Commission and Major Russell, the District Engineer of the Alaska Road Commission sent the following letter to the Commanding Officer, Fairbanks, Alaska:
Williams Equipment Company and Reed & Martin, Inc., have a contract with Alaska Road Commission for constructing the Fairbanks to College and portion of Steese Highway Road Project.
We have been informed that there is an asphalt plant at Ladd Field, which, if proper arrangements could be made between the contractor and the Air-Installation Officer for use of the plant would materially aid in an early completion of the road project.
Your consideration of this matter would be greatly appreciated.
On July 20, 1950, Major Russell transmitted the above letter to his superior officer with the recommendation that the request be granted.
The Alaska Road Commission had a policy against renting Government-owned equipment to any of its contractors since it was felt such action might prejudice other bidders on a project. However, since no other asphalt plant could be made available to complete this project before the close of the season, an exception was made in this case and the request made for the loan of the plant as set out above. The request was granted and the plant was made available for the use of the plaintiffs. It was not in good operating condition at that time and it accordingly became necessary for the plaintiffs to do considerable work thereon and make certain repairs before it could be used. It was thereafter used by the plaintiffs as contemplated in the performance of the contract.
38. Discussions were had between plaintiffs and representatives of the Alaska Road Commission as to the proper rental for the asphalt plant. It was agreed that had plaintiffs rented the plant in the State of Washington as originally contemplated, the rental, transportation charges, costs of erection and dismantling would total about $10,700. That amount was divided by the estimated quantity of plant mix to be laid giving a figure of $1.30 per ton as a rental figure for the plant. While the plaintiffs orally agreed to that *478 rental figure, when they did so they relied upon the assurance previously given by Major Russell that they would be paid by the Ladd Air Force Base authorities for the work heretofore referred to which they had done at Ladd Field. Shortly thereafter Major Russell advised the plaintiffs that payment could not be made for the seal coating which had been performed at Ladd Field. As a result of the failure to receive payment for the work which they had performed at Ladd Field, the plaintiffs refused to sign a change order prepared by the Alaska, Road Commission reducing the unit price of asphalt perron by $1.30 which reduced the estimated total of the contract by $10,790.
39. Under date of October 13, 1950, the contracting officer directed that the change order be considered a written order changing the specifications and that the rental stipulated therein be deemed to be an equitable adjustment of the contract price. He advised plaintiffs of their right to appeal from that determination to the designated representative of the head of the department. This was one of the matters discussed at the conference in April 1951 heretofore referred to and was within the scope of the appeal taken by plaintiffs to the designated representative of the head of the department. In denying the appeal such representative stated in his letter of June 15,1951, as follows:
PlaNt Rental
The decision of the Contracting Officer set forth in his letter of October 18 has been reviewed and is hereby affirmed by the undersigned as Authorized Representative of the Head of the Department. Since the Change Order, previously presented to you, modifies the unit price of Item No. 140 (1), in strict accordance with the initial agreement, the modified price has been used in the accompanying voucher rather than indicating a deduction for plant rental. In order that final settlement on this contract may be made it is again requested that you execute Change Order No. 2 and return the indicated papers to this office.
The plaintiffs refused to execute the change order. Upon completion of the contract, it was determined that 7,820.3 tons of asphalt had been actually used and accordingly $10,166.39 was deducted from payments to the plaintiffs. No *479 amount has been paid to the plaintiffs on account of the work done at Ladd Field.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs are entitled to recover, and it is therefore adjudged and ordered that they recover of and from the United States forty-five thousand eight hundred ninety-five dollars and forty cents ($45,895.40).

 The slide created several difficulties in applying this method of measurement. A considerable part of the material which had broken loose as a result of the slide was still on the face of the quarry at the time of the final survey. In fact, in certain parts of the quarry the final survey profiles indicated that the face of the cliff had expanded over the original profile lines. The slide material, as a result of having been dislodged from its original position, had expanded considerably beyond the volume it occupied in the original position. This expansion tended to make the profile lines of the final survey appear to have receded less than they would otherwise have done. To the extent, therefore, that such slide material was still on the face of the quarry the end area method tended to understate the net volume of material in place actually removed from the face of the quarry by the plaintiffs. The slide also created fissures, some of which had the effect of moving the face of the quarry forward beyond the point where it would otherwise have been. This again tended to understate the amount of material removed by plaintiffs when- using the end area method. The defendant made no corrections for these factors in its computations.
Furthermore, the slide carried substantial amounts of material from parts of the quarry that had not originally been surveyed into parts where the plaintiffs’ quarrying operations were going forward. It became necessary, therefore, to find out the original profile of the unsurveyed parts of the quarry. This could be done only by use of interpolations from those parts of the quarry which had been surveyed at the beginning, a process which tended to create some inaccuracies.

 This diagram was evidently made by comparing the plans of the vertical cross sections before and after the road was built. The road as finished deviated in certain respects from the plans with the result that additional borrow was required over that contemplated on the plans. Furthermore, the new road was built on top of an old road which sank in some places during the construction and thus required additional fill. Neither of these factors was accounted for in the mass diagram.

 The specific gravity method used by the defendant consisted of two parts. The first part determined that a 3-ton truck loaded level to the bed of the truck contained 33 percent voids and 67 percent solid rock by volume. The 33 percent figure was arrived at by taking the specific gravity of representative samples of rock and applying this specific gravity to the weight and volume of the load of a 3-ton truck loaded level to the top of its bed. It does not appear, however, that this 33 percent figure was intended to represent the exact increase in the volume of material from its virgin state to its volume loaded on the truck since no account was taken of voids that might occur in the material in the virgin state. Furthermore, the amount of voids in a small 3-ton truck might well be considerably less than the voids in 6-, 7-, or 8-ton trucks which were the types of sizes actually used. The following computa *443 tion, though not made by defendant’s engineers, is significant. Assuming that the total cubic yards of plaintiffs’ truck-count figures took into account a uniform swell factor of 25 percent, then the uncorrected volume of material removed amounts to 132,789 cubic yards; if the plaintiffs’ truck-count figure used a swell factor of 20 percent, then the uncorreeted volume amounts to 124,490 cubic yards. Applying the 33 percent swell factor of the specific gravity test to those figures yields 88,946 and 83,408 cubic yards, respectively
The other part of the specific gravity method determined the percentage of voids in the heaped load on a truck having a sideboard level capacity of 6.35 cubic yards. The bed of this truck had inside dimensions of 6.6' x 10.0' x 2.6' as compared to 6.5' x 7.96' x 1.56' of the truck that was used in the previous test. The volume of the heap on such a truck was estimated to be ten-eighths of the volume of the heap on a test truck, or ten-eighths of 1.28 cubic yards which equals 1.60 cubic yards. The total load yardage for such a truck in heaped condition was, therefore, 6.35 cubic yards plus 1.60 cubic yards, which equals 7.95 cubic yards. Applying the 33 percent figure computed above, the engineers arrived at an actual volume of rock of 5.33 cubic yards. The defendant’s engineers further assumed that such heaped 6.35 cubic yard trucks were credited with actually having hauled seven cubic yards of material in the plaintiffs’ truck-count computation. The basis for this assumption is not clear. Dividing 5.33 into 7, the defendant determined that plaintiffs had only excavated 76 percent of the amount with which they were credited under the truck-count method. This percenage was then applied generally to the total cubic yardage which the truck-count method had credited to the plaintiffs, that is, 76 percent of 99,592 cubic yards, which is approximately 76,000 cubic yards.