Per Curiam
: This case was referred to Trial Commissioner Mastín G. White pursuant to Eule 45 with directions to make findings of fact and recommendations for conclusions of law. The commissioner has done so in a report filled January 6, 1960. Briefs were filed by both parties, exceptions to the commissioner’s findings were taken by the defendant and the case was submitted to the court on oral argument by counsel. Since the court is in agreement with the findings and recommendations of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore entitled to recover and judgment will be entered to that effect with the amount of recovery to be determined in further proceedings pursuant to Eule 38(c).
It is so ordered.
OPINION OP THE COMMISSIONER
This case involves a controversy that arose out of a contract covering the construction of a levee in Florida by the plaintiff for the Corps of Engineers, Department of the Army.
In accordance with Eule 38 (c), the trial was limited to the issues of law and fact relating to the right of the plaintiff to recover, and the determination of the amount of recovery and the amount of offsets, if any, was reserved for further proceedings.

Embankment Placed

The principal legal question in the case relates to the interpretation that should be given to a contract provision stating that:
Payment for construction of [the southern section of the] levee * * * will be made on the basis of quantities of embankment placed. Measurements of quantities to *173 be paid for will be made by computing the volume between the ground surface existing after stripping of levee base is completed, and the specified construction cross-section. * * *
The events leading up to the present litigation began on April 3,1951, when the Corps of Engineers issued specifications, drawings, and invitations for bids relative to the prospective construction of Levee L-40 in Florida. The work was to consist of constructing 26.2 miles of continuous levee, running generally from north to south, with materials excavated from a continuous borrow pit along the west side of, and parallel to, the levee. The borrow pit was to be separated from the levee by a 40-foot strip of land. It was indicated that, before the actual excavation of material from the borrow pit and its placement as part of the levee began, both the surface of the borrow pit and the base of the levee were to be cleared and stripped of all vegetation, stumps, and roots.
The levee was to comprise two sections: a northern section slightly more than 2 miles in length, and a southern section slightly more than 24 miles in length. Only the southern section is involved in the present litigation.
The levee was to traverse a low, fiat, wet area along the eastern edge of the Everglades. The ground in the particular area consisted, first, of a layer of peat, which is an organic, fibrous, compressible, and rather unstable soil. Prospective bidders were informed that wherever in the southern section the thickness of the peat exceeded 4 feet, the peat should be removed from the borrow pit down to the point where the average thickness of the peat remaining in the borrow pit would be 3 feet. The excess peat so removed was to be wasted (i.e., it was to be deposited alongside and to the west of the borrow pit, and was not to be used as material for placement in the levee). Beneath the peat, there was a mixture of sand, shell, and conglomerate rock. The peat remaining in the borrow pit after the stripping operation and the removal and wasting of the excess peat (if required) was to be used along with the underlying material as part of the levee.
*174 It was indicated that payment for the work performed in the northern section, and for the removal of the excess (or waste) peat from the borrow pit in the southern section, would be made on the basis of the quantity of material excavated from the borrow pit. In connection with this phase of the work, bidders were to quote as Item No. 1 a unit price of so much per cubic yard for “Excavation, unclassified.”
On the other hand, prospective bidders were informed that the work of constructing the levee in the southern section would be paid for in accordance with the provision quoted at the beginning of this part of the opinion. Bidders were to quote as Item No. 2 a unit price per cubic yard for “Embankment” in connection with the construction work in the southern section.
The plaintiff submitted the lowest bid on the levee job mentioned above, and a contract was entered into between the plaintiff and the defendant (represented by a contracting officer of the Corps of Engineers) on May 7, 1951. The plaintiff’s bid and the contract fixed $0,422 per cubic yard as the unit price for Item No. 1, “Excavation, unclassified,” and the same amount per cubic yard as the unit price for Item No. 2, “Embankment.”
The contract contained the provision previously quoted at the outset of this part of the opinion with respect to the basis of payment for the construction of the southern section of the levee.
In constructing the northern section of the levee, and in removing from the borrow pit and wasting excess peat in the southern section, the plaintiff excavated 1,039,599 cubic yards of material from the borrow pit. The Corps of Engineers paid the plaintiff for this work at the contract unit price of $0,422 per cubic yard for “Excavation, unclassified” (Item No. 1), or a total of $438,710.78. There is no controversy between the parties respecting this phase of the work or the sufficiency of this payment.
In the southern section, after the levee base and the surface of the borrow pit had been stripped and the excess peat in the borrow pit had been removed and wasted, the plaintiff excavated from the borrow pit 4,798,058 cubic yards of material. A total of approximately 4,618,058 cubic yards of *175 this material was placed by the plaintiff upon the prescribed levee site; and the remainder of the material (or approximately 180,000 cubic yards) was either spilled on the 40-foot strip of land separating the borrow pit from the levee site or was placed on the strip by the plaintiff to improve the working surface, and was not recovered by the plaintiff for placement as part of the levee.[1] With the placement of the 4,618,058 cubic yards (approximately) of material upon the prescribed levee site, the peat comprising the ground surface of the levee base, as it existed upon the completion of the stripping operation, subsided beneath the weight of the added material and became inextricably mixed with it. The whole mass sank until it came to rest on the underlying sand, shell, and rock. This occurred during the construction of the levee, and before the embankment was measured for payment purposes.
Of the total of approximately 4,618,058 cubic yards of material which the plaintiff placed upon the prescribed levee site in the southern section, approximately 1,288,617 cubic yards of the material either subsided ('along with the ground surface of the levee base) below the line representing the elevation of the ground surface as it had existed after the stripping of the levee base and before the addition of the material from the borrow pit, or disappeared in the form of shrinkage as the wet material dried out after being incorporated in the levee embankment. As indicated above, this occurred during the process of construction, and before the embankment was measured for payment purposes. Neither the plaintiff nor the Corps of Engineers anticipated, at the time when the contract was made, that the subsidence and shrinkage would be of such magnitude and would occur so early in the life of the levee.
Measurement of the completed southern section of the levee revealed that the levee embankment, above the line representing the elevation of the ground surface as it had *176 existed after the stripping of the levee base and before the addition of material from the borrow pit, comprised a total of 3,329,441 cubic yards. This total included 99,005 cubic yards of overbuilding beyond the tolerance provided for in the specifications. The Corps of Engineers deducted the 99,005 cubic yards of overbuilding from the 3,329,441 cubic yards previously mentioned, multiplied the remainder of 3,230,436 cubic yards by the contract unit price of $0,422 per cubic yard for “Embankment” (Item No. 2), and thus computed that the plaintiff was entitled under the contract provision quoted at the beginning of this part of the opinion to a total of $1,363,243.99 for constructing the southern section of the levee. Payment on this basis was made to the plaintiff under an arrangement whereby the plaintiff reserved the right to attempt to recover additional compensation.
In administrative proceedings which the plaintiff unsuccessfully prosecuted through various levels in the Department of the Army, up to and including the head of the Department, the plaintiff contended that it was entitled, in connection with the construction of the southern section of the levee, to additional compensation for 1,567,622 cubic yards of material at the contract unit price of $0,422 per cubic yard for “Embankment” (Item No. 2). It was the plaintiff’s position in the administrative proceedings — and the plaintiff adheres to such position in the present litigation — that it excavated from the borrow pit and placed upon the prescribed levee site in the southern section 1,567,622 cubic yards of material over and above the 3,230,436 cubic yards of material used by the Corps of Engineers as the basis for computing the payment due the plaintiff in connection with the construction of the southern section.
The record before the court sustains the plaintiff’s contention with respect to the excavation of the additional 1,567,622 cubic yards of material from the borrow pit in the southern section. However, the record establishes that 99,005 cubic yards of this material went into overbuilding beyond the tolerance provided for in the specifications; and the plaintiff now concedes that it is not entitled to any additional compensation with respect to this yardage involved in the *177 overbuilding. Moreover, it is also clear from the record that some of the 1,567,622 cubic yards of material (and the portion is estimated for present purposes at approximately 180,000 cubic yards) was spilled on the 40-foot strip of land separating the borrow pit from the levee, or was placed there by the plaintiff to improve the working surface, and never became part of the levee embankment.
On the other hand, the evidence definitely establishes that the major portion of the additional 1,567,622 cubic yards of material which the plaintiff excavated from the borrow pit in the southern section was placed upon the prescribed levee site and either subsided (along with the ground surface of the levee base) below the line representing the elevation of the ground surface as it had existed after the stripping of the levee base and before the addition of material from the borrow pit, or disappeared in the form of shrinkage as the wet material dried out after being incorporated in the levee embankment. The primary question in the case is whether the plaintiff is entitled to compensation for the placement of this material upon the prescribed levee site.
The contract provision with which we are concerned in this part of the opinion begins with a sentence which states in plain, unequivocal language that “Payment for construction of [the southern section of the] levee * * * will be made on the basis of quantities of embankment placed.” It then proceeds to deal with the subject of how such quantities shall be acertained for the purpose of calculating the payment due the plaintiff, and says in the second sentence that “Measurements of quantities to be paid for will be made by computing the volume between the ground surface existing after stripping of levee base is completed, and the specified construction cross-section.” It is clear that, from the standpoint of syntax, -the second sentence is subsidiary to the first sentence.
All the material which the plaintiff excavated from the borrow pit and placed upon the prescribed levee site in the southern section pursuant to the contract specifications was “embankment placed,” as that term is ordinarily understood, and qualified for payment under the primary “Payment” sentence of the pertinent contract provision. However, the *178 subsidiary “Measurements” sentence, as written, was impossible of application under the circumstances of this case, because when the time came to calculate the amount due the plaintiff for the construction of the southern section of the levee, the “ground surface existing after stripping of levee base” had subsided and disappeared, and was no longer in existence. The inability to apply the subsidiary “Measurements” sentence did not, of course, relieve the defendant of its basic obligation under the primary “Payment” sentence to pay for the construction of the southern section of the levee “on the basis of quantities of embankment placed.” Russell H. Williams et al. v. United States, 130 Ct. Cl. 435, 441 (1955). Such quantities were susceptible of being ascertained with reasonable accuracy by methods other than that mentioned in the subsidiary “Measurements” sentence.
The Corps of Engineers undertook to apply the “Measurements” sentence by interpreting it as though it stated that “Measurements of quantities to be paid for will be made by computing the volume between ['the line representing the elevation of] the ground surface existing after stripping of levee base is completed, and the specified construction cross-section.” However, the attempted revision and application of the subsidiary “Measurements” sentence in this fashion was inconsistent with the basic obligation of the defendant under the primary “Payment” sentence to pay for, and the basic right of the plaintiff to be compensated for, the “quantities of embankment placed,” because large “quantities of embankment placed” were not paid for under the revised “Measurements” sentence.
We are dealing here with a contract provision that was drafted by Government personnel. In view of this factor, it would be inappropriate for the court to follow the example of the Corps of Engineers by adopting an interpretation of the provision which would, in effect, ignore the primary “Payment” sentence and expand the language of the subsidiary “Measurements” sentence in order to make the subsidiary sentence meaningful and controlling under the circumstances of the present case, since such an interpretation would favor the defendant and be disadvantageous to the plaintiff. Peter Kiewit Sons’ Co. v. United States, 109 Ct. Cl. *179 390, 418 (1947); Rosa Orino, Executrix v. United States, 111 Ct. Cl. 491, 518-519 (1948).
For the reasons stated above, it is my opinion that the “Payment” sentence should be given effect, and, accordingly, that the plaintiff is entitled to recover additional compensation for those “quantities of embankment placed” in the southern section of the levee that have not been paid for by the defendant heretofore.

Liquidated Damages

The contract contained a paragraph stating in part as follows:
The Contractor will be required to commence work under the contract within 30 calendar days after the date of receipt by him of notice to proceed and prosecute the said work at an average rate per month of not less than 375,000 cubic yards * * *, and to complete the work within the number of days after the limiting date set for commencement as determined by applying the average monthly rate above stipulated to the aggregate of total quantities of material actually excavated (under Item 1) and actually placed in the embankment (under Item 2) and to be paid for under the contract * * *.
The contract then provided that:
In case of failure on the part of the Contractor to complete the work within the time fixed in the contract or any extensions thereof, the Contractor shall pay the Government, as liquidated damages, the sum of $200.00 for each calendar day of delay until the work is completed or accepted.
The plaintiff receive4 a notice to proceed on June 22,1951. This fixed July 22, 1951, as the date on which the plaintiff was required to commence work under the contract. The work was completed by the plaintiff and accepted by the Corps of Engineers on December 29, 1952.
As indicated in the first part of this opinion, the Corps of Engineers calculated that the plaintiff was entitled to payment for 1,039,599 cubic yards of “Excavation, unclassified” (Item No. 1) and 3,230,436 cubic yards of “Embankment” (Item No. 2), or a grand total of 4,270,035 cubic yards. On this basis, the Corps of Engineers regarded July 4, 1952, as the date on which the plaintiff was required to complete all *180 tbe work under tbe contract. Accordingly, the Corps of Engineers assessed against the plaintiff liquidated damages at tbe contract rate of $200 per day for 178 days of delay from July 5,1952, to December 29,1952, or a total of $35,600. This amount was ■withheld by the Corps of Engineers in paying to the plaintiff the amount of compensation believed by the Corps of Engineers to be due the plaintiff for the work under the contract. Such action, although protested by the plaintiff, was sustained in the administrative proceedings mentioned in the first part of the opinion.
I believe, for the reasons given earlier in this opinion, that the plaintiff is entitled to compensation for additional “quantities of embankment placed,” over and above the 3,230,436 cubic yards used by the Corps of Engineers in calculating the amount of compensation due the plaintiff for the construction of the southern section of the levee and the length of time that was available to the plaintiff for the completion of the work. If my view on that point is correct, the final date for the completion of the work was not July 4, 1952, as determined by the Corps of Engineers, but some subsequent date based upon a calculation that would take into account the additional “quantities of embankment placed.”
It necessarily follows that, in my opinion, the plaintiff is entitled to recover at least some of the liquidated damages assessed and withheld by the Corps of Engineers.
FINDINGS OF FACT
1. The plaintiff is a New Jersey corporation, with its principal office and place of business in West Palm Beach, Florida.
2. (a) On April 3, 1951, the defendant, acting through the Jacksonville District, Corps of Engineers, Department of the Army, issued specifications, drawings, and invitations for bids relative to the prospective construction of Levee L-40, which was to be situated in Palm Beach County, Florida, west and southwest of the city of Palm Beach, and was to be part of the Central and Southern Florida Flood Control Project.[2]
*181 (b) The work was to consist of constructing 26.2 miles of continuous levee, running generally from north to south, with materials excavated from a continuous borrow pit along the west side of, and parallel to, the levee. The borrow pit was to be separated from the levee by a 40-foot strip of land. It was indicated that, before the actual excavation of material from the borrow pit and its placement as part of the levee began, both the surface of the borrow pit and the base of the levee were to be cleared and stripped of all vegetation, stumps, and roots.
(c) The levee was to comprise two sections: a northern section slightly more than 2 miles in length, and a southern section slightly more than 24 miles in length. The work to be accomplished in both sections was substantially the same. Only the southern section is involved in the present litigation.
(d) The levee was to traverse a low, flat, wet area along the eastern edge of the Everglades. The ground in the particular area consisted, first, of a layer of peat. Florida peat is an organic, fibrous, compressible, and rather unstable soil. The average depth of the peat along the proposed route of the northern section of the levee was substantially greater than the average depth of the peat along the proposed route of the southern section, although there were places in the southern section where the layer of peat exceeded 4 feet in depth. Prospective bidders were informed that wherever in the southern section the thickness of the peat exceeded 4 feet, the peat should be removed from the borrow pit down to the point where the average thickness of the peat remaining in the borrow pit would be 3 feet. The excess peat so removed was to be wasted (i.e., it was to be deposited alongside and to the west of the borrow pit, and was not to be used as material for placement in the levee). Beneath the peat, both in the northern and southern sections, there was a mixture of sand, shell, and conglomerate rock. The peat remaining in the borrow pit after the stripping operation and the removal and wasting of the excess peat (if required) was to be used along with the underlying material as part of the levee.
(e) It was indicated that payment for the work performed in the northern section was to be made on the basis of the *182 quantity of material excavated from' the borrow pit. In connection with this phase of the work, bidders were to quote as Item No. 1 a unit price of so much per cubic yard for “Excavation, unclassified.”
(f) It was indicated that the removal of the excess (or waste) peat from the borrow pit in the southern section was to be paid for at the contract unit price for “Excavation, unclassified,” but that the work of actually constructing the levee in the southern section was to be paid for “on the basis of quantities of embankment placed”; and bidders were to quote as Item No. 2 a unit price per cubic yard for “Embankment” in connection with the construction work in the southern section. It was stated that “Measurements of quantities to be paid for [as embankment] will be made by computing the volume between the ground surface existing after stripping of levee base is completed, and the specified construction cross-section.”
(g) The Corps of Engineers informed prospective bidders that, according to its estimate, there would be 1,100,000 cubic yards of “Excavation, unclassified” and 3,100,000 cubic yards of “Embankment.”
(h) Prospective bidders were put on notice that they should satisfy themselves regarding (among other things) “* * * the conformation and condition of the ground, * * * [and] the character, quality and quantity of surface and subsurface materials to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government * * *■>: Prospective bidders were informed that the Corps of Engineers had made probings and borings to determine the depth and character of the materials expected to be encountered in the performance of the work, and that these data were available for examination. There is nothing in the evidence to indicate that such data failed to reflect the true situation to any substantial degree.
3. Three bids were received in response to the invitations. The amounts of these bids, together with the Government estimate, are shown below:

*183
Excavation,

Unclassified Embankment Total

Government estímate_$410, 30.0. 00 $1, 500, 400.00 $1, 910,700. 00
Clemens Construction
Company__,_ 464,200. 00 1, 303, 200. 00 1, 772, 400. 00
Badgett Mine Stripping Corp 467, 500. 00 1,317, 500. 00 1, 785, 000.00
S. A. Healy Co_•_ 913, 000. 00 2, 511, 000. 00 3, 424, 000.00
4. The contract was awarded to the plaintiff, and contract No. DA-08-123-ENG-684 was entered into between the plaintiff and the defendant, represented by a contracting officer of the Corps of Engineers, on May 7, 1951. By the terms of the contract, the plaintiff agreed to perform all the work and to furnish all the materials necessary for the construction of Levee L-40. The total estimated consideration provided for in the contract was $1,772,400, in accordance with the following unit prices bid by the plaintiff and set forth in the contract as Schedule I:

Item Estimated Unit Estimated

No. Description Quantity Unit Price 4-mount

1 Excavation, unclassified- 1,100, 000 Cu. Yd. $0.422 $464, 200. 00
a Embankment ,_ 3,100, 000 Cu. Yd. 0.422 1,308, 200.00
Total_,__ $1,772,400.00
5. The contract contained the standard provisions that are customarily included in Government construction contracts. Among them were the following:
ARticle 3. Changes and Extras. — The Contracting Officer may at 'any time, in writing, and without notice to the sureties, order extras or make changes in the drawings and/or specifications of this contract providing such extras or changes are within the general scope thereof. If such extras or changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment Shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this article must be asserted in writing within 30 days from the date the extra or change is ordered: Provided, however, That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and, subject to such approval as the 'head of the department may require, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Article 6 hereof. But nothing provided in this article shall excuse the *184 Contractor from proceeding with, the prosecution of the work.
article 4. Changed Conditions. — Should the Contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent physical conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown physical conditions of an unusual nature differing materially from those ordinarily encoimtered and generally recognized as inhering in work of the character provided for in the plans and specifications, the Contracting Officer shall be notified immediately in writing of such conditions before they are disturbed. The Contracting Officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ, the contract shall, subject to such approval as the head of the department may require, be modified to provide for an equitable adjustment in contract price and/or difference in time resulting from such conditions. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Article 6 hereof.
ARTICLE 5(C). TIME extensions. — The right of the Contractor to proceed shall not be terminated as provided in this article, nor the Contractor charged with liquidated or actual damages, because of any delays in the completion of the work due to causes beyond his control and without his fault or negligence, including but not restricted to, acts of God, or of the public enemy, acts of the Government, either in its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargo and unusually severe weather, or delays of subcontractors due to such causes; provided, however, that the Contractor shall promptly notify the Contracting Officer in writing of the causes of such delay. Upon receipt of such notification the Contracting Officer shall ascertain the facts and the extent of such delay and, if in his judgment the facts so justify, shall extend the time for completing the work commensurate with the Eeriod of excusable delay. The Contracting Officer’s ndings of fact thereon shall constitute his decision which shall be final and conclusive on the parties hereto subject to appeal by the Contractor within thirty (30) days therefrom as provided in the “Disputes” Article herein.
*185 article 6. disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer subject to written appeal by the Contractor within 30 days to the head of the department concerned or his duly authorized representative whose decision shall be final and conclusive upon the parties hereto. In the meantime the Contractor shall diligently proceed with the work as directed.
6. Pertinent portions of the contract specifications are set out below:
PART I — STATEMENT OP WORK
sw-i description op work. a. Work to be done. (See Article 1 of the Contract.) The work consists of furnishing all plant, labor, materials and equipment and performing all work in strict accordance with these specifications and the schedules and drawings forming parts thereof for constructing Levee L-40, a section of the Central and Southern Florida Flood Control Project, situated in Palm Beach Comity, west and southwest of West Palm Beach, Florida, complete at all points, in accordance with the sections, alinement, grades and details indicated on the contract drawings. The work consists of constructing 26.2 miles of continuous levee (with materials excavated from a continuous borrow pit along the west side of the levee), commencing at a point on the north bank of Hillsboro Canal (across the canal from the north end of Levee L-S6, 6 miles west of State Boad No. 7) and running in a curving northerly direction to the point where it connects with the south end of a 2.66 mile section of the north portion of Levee L-1^0, (extending southward from the West Palm Beach Canal near Loxahatchee) under an existing contract. The cost of the work including all incidental cost shall be included in the unit prices quoted by the Contractor in his bid.
b. Location. The levee to be constructed is situated in Palm Beach County, Florida, west of State Boad No. 7 and southwest of West Palm Beach, Florida. The work site is along and within the east edge of the Everglades, roughly 15 miles inland from the Coast. It extends from Hillsboro Canal, to a point about 2y2 miles south of State Boad No. 80. The City of West Palm Beach is shown on all standard maps of the State of Florida.
*186 PART II — GENERAL CONDITIONS
go — i scope oe work. — The work to be performed under this contract consists of furnishing all plant, materials, equipment, supplies, labor and transportation, including fuel, power, water (except any materials, equipment, utility or service, if any, specified herein to be furnished by the Government) and performing all work as required by Article 1 of the contract in strict accordance with the specifications, schedules and drawings all of which are made a part hereof, and including such detail drawings as may be furnished by the Contracting Officer from time to time during the prosecution of the work in explanation of said drawings.
* % * ÍJ5 *
GC-3 SITE INVESTIGATION AND REPRESENTATIONS. — The Contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, roads and uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and condition of the ground, the character of equipment and facilities needed preliminary to and during the prosecution of the work and all other materials upon which information is reasonably obtainable and which can in any way affect the work or the cost thereof under this contract. The Contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of surface and subsurface materials to be encountered insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from information presented by the drawings and specifications, made a part of this contract. Any failure by the Contractor to acquaint himself with all the available information will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any understanding or representations made by any of its officers or agents during or prior to the execution of this contract, unless (1) such understanding or representations are expressly stated in the contract and (2) the contract expressly provides that responsibility therefor is assumed by the Government. Representations made but not so expressly stated and for which liability is not expressly assumed by the Gov- *187 eminent stall be deemed only for the information of the Contractor.
% íJí íj: % íj:
PART m — SPECIAL CONDITIONS
SC-1 COMMENCEMENT, PROSECUTION AND COMPLETION. — The Contractor will be required to commence work under the contract within 30 calendar days after the date of receipt by him of notice to proceed and prosecute the said work at an average rate per month of not less than 375,000 cubic yards either as “Excavation, unclassified” (under Item 1 of the Unit Price Schedule) or as “Embankment” (under Item 2 of the Unit Price Schedule) or both, and to complete the work within the number of days after the limiting date set for commencement as determined by applying the average monthly rate above stipulated to the aggregate of total quantities of material actually excavated (under Item 1) and actually placed in the embankment (under Item 2) and to be paid for under the contract; provided that the aggregate quantities of “Excavation, unclassified” (under Item 1) and “Embankment” (under Item 2) excavated and placed in any one month after the limiting date set for commencement shall in no case be less than 300,000 cubic yards; provided further, that no waiver by the Contracting Officer of any failure of the Contractor to make in any month or series of months the rate of progress required by this paragraph shall be construed as relieving the Contractor of the obligation to make up the deficiency in future months and to com-§lete all work under Items 1 and 2 of the Unit Price chedule within the time allowed by the contract,
sc — 2 liquidated damages. — In case of failure on the part of the Contractor to complete the work within the time fixed in the contract or any extensions thereof, the Contractor shall pay the Government, as liquidated damages, the sum of $200.00 for each calendar day of delay until the work is completed or accepted.
sc — 3 estimated quantities. — The quantities listed on the Unit Price Schedule are estimates only.. Within the limit of available funds the Contractor will be required to complete the work specified herein in accordance with the contract and at the contract price or prices whether it involves quantities greater or less than estimated.
*188 sc — 6 physical data. — Information and data furnished or referred to below are not intended as representations or warranties but are furnished for information only. It is expressly understood that the Government will not be responsible for any interpretation or conclusion drawn thereform by the Contractor.
a. Surface and subsurface conditions. A survey of the site of the work has been made, including probings, auger and core borings in connection with the surface investigation to determine the elevation and conformation of the ground and the depth and character of materials expected to be encountered in the performance of the work. The depth and character of materials, as estimated from these explorations, are indicated on the contract drawings. The cores may be inspected at the Corps of Engineers Dredge Depot on Talleyrand Ave., Jacksonville, Fla.
b. Site and weather conditions. The levee to be constructed runs in a curving south to north direction from a point on Hillsboro Canal across the canal from the north end of Levee L-36 and about 6 miles west of State Road No. 7, to its north end south of Loxahatchee on State Road No. 80. The middle section of the levee is about a mile west of State Road No. 7 and the extreme north end of the work is about 9 miles west of that road. The levee traverses the low flat area along the east edge of the Everglades seasonally inundated and characterized by a surface layer of peat, extensive areas of saw grass and variable other vegetation in certain areas ranging from patches of brush to small trees, cypress stumps and other vegetation. During normal seasonal weather the area is inundated with water from June to November and dry from November to June. Under dry conditions the vegetation is very inflammable and, under exceptionally dry conditions, the peat will burn to considerable depth. The area is subject to tropical storms from July to November and at times the water elevation may be such that work may be difficult.
‡ ;£ # % %
PART IV — TECHNICAL PROVISIONS
SECTION I — LEVEE
1-01 scope. — The work covered by this section consists of the construction of all levees covered by the specifications and the applicable drawings. The levee to be constructed is approximately 26.2 miles long. It extends from station 7+45, just north of the Hillsboro Canal, to station 1886+31.31, about 2 miles south of the *189 West Palm Beacb Canal; at tbe latter point this levee will connect to another section of levee now under construction under a separate contract. It is the intent of these specifications to secure an embankment which is stable both during construction and after completion, and which is as impervious as can be obtained practicably, utilizing the materials available and with the method of construction employed.
1-02 clearing and stripping. — The base of the levee and the surface of the borrow pit used shall be cleared and stripped of all surface vegetation including roots. All stumps shall be removed and in the levee foundation area all roots larger than 1%" in diameter shall be grubbed for a depth of 2 feet below the surface of the ground. Stripped material shall be wasted on the land-side of the levee or on the pool side (westerly) of the borrow pit; no materials shall be wasted within 10 feet of the levee toe or within 25 feet of the borrow pit, but the Contractor will be permitted to utilize wasted materials on the berm to improve tracking conditions, if he so desires. Materials wasted on the pool side of the borrow pit shall not form a continuous mound; openings to permit water to drain into the borrow pit shall be left at intervals of not more than 1,000 feet, and these openings shall comprise not less than 20% of the length of continuous stretches between the openings. No separate payment will be made for clearing or stripping and the cost thereof shall be included in the appropriate contract unit price for “Embankment” or “Excavation, unclassified”.
1-03 embanKment. — a. Gross-seotion. The levee shall be constructed to the grades and cross-sections indicated on the drawings, except that the Contractor may be required to flatten the slopes, in order to increase the stability of the section, where pockets of peat are encountered of such thickness that the slopes originally prescribed apparently will not provide a stable section. Such changes in cross-section shall be gradual but may be made within a linear distance of 50 feet. A tolerance of 0.5 feet above or 0.3 feet below the specified construction grade will be allowed provided that the slopes connect as plane surfaces with the levee toes as determined by applying the required slopes to the specified construction grade. The Contractor will be permitted to construct the levee to a higher grade, for his own convenience, provided that the finished levee is free from abrupt humps or hollows, but the volume of any materials lying outside of the tolerance limits specified herein *190 will not be paid for. Measurement to determine the height to which the levee is actually constructed will be made after dressing but prior to placing peat blanket.
b. Construction. Along some portions of the levee location, the thickness of the layer of peat in the borrow area is such that a portion of it will have to be wasted to avoid an excessive proportion of peat in the embankment ; provisions pertaining to wasting of peat are contained in later paragraphs. The Contractor shall so arrange his operations that the peat remaining on the borrow area, after stripping has been done and after any peat to be wasted has been removed, will be mixed with the other materials as they are placed in the levee. Eock shall be blasted or 'broken so that not more than 5% of the rock placed in the levee shall have a dimension greater than 2 feet. The Contractor shall exercise such control of deposit of materials as is necessary to prevent the. collection of several large rock particles in one place with resultant voids which will not be filled with small particles.
o. Peat blanlcet. The levee surface shall be dressed to reasonably plane surfaces, which shall be free of major humps or depressions. After dressing, the levee crown and side slopes shall be covered with a blanket of peat, approximately 6 inches thick on the slopes and 3 inches thick on the crown. For the blanket, the Contractor will be permitted to use material stripped from the levee base provided that the material so used shall not contain any brush, tree roots, or other wood; the inclusion of grass and grass roots in the blanket is desirable provided that such vegetation does not comprise more than 30 to 40 percent of the blanket material. Dressing of the blanket surface to the extent which can be done with a dressing bucket or a dragline is all that is required on the slopes; the entire crown surface shall be compacted by one complete coverage by the tracks of caterpillar-type tractor weighing not less than 12 tons. No separate payment will be made for the peat blanket, and the cost thereof shall be included in the contract unit price for “Embankment,” or “Excavation, unclassified.” Stripped material stockpiled for later use in the peat blanket is not subject to the restriction of 10 feet from levee toe, mentioned in paragraph 1-02 above.
‡ jfs ‡
1-04 BORROW bits. — a. Cross-section. The borrow pit from which material is to be obtained shall be excavated continuously, to the cross-section indicated on the *191 plans. The minimum top width shall be 100 feet; no increase over widths indicated on plans shall be made without specific authority; the elevation of the bottom of borrow pit shall not exceed 5 feet m.s.l. at any point, and changes in depth and width shall be made as gradually as is practicable under the conditions encountered. Uniform slopes on the back of the borrow pit are not required and slopes may be varied as desired provided they are stable; however, the slope next to the berm shall not be steeper than 1 on 3, and the slope on the opposite side shall not be steeper than 1 on 1%.
5. 'Wasting feat. 1. Between approximate stations 1275 and 1386 (upper end of the work) the peat on the borrow area shall be removed and wasted in areas indicated on the plans. If wasted peat is removed by hydraulic dredge, pai'ticular care shall be taken that the specified side slope of borrow pit next to the berm shall not be undercut, and any material immediately adjacent to the specified berm, which it is not practicable to remove with the dredge, may be left in place or utilized in the levee if the remainder of the excavation is performed by drag-line. Stripping of the borrow area will not be required between the above stations. The estimated quantity of peat to be wasted between the above stations is 450,000 cubic yards.
8. Between stations 7+45 and 1275, subsurface explorations indicate that intermittent reaches exist where the thickness of peat exceeds 4 feet. Wherever such a condition is encountered, the Contractor shall remove the peat from the borrow pit down to an elevation generally 3 feet above the top of the sand, marl, or other material underlying the peat, and waste it on the pool side of the borrow pit. The restrictions regarding disposal of waste material in paragraph 1-02 above shall be applicable to the wasting of excess peat also; the openings for drainage referred to in paragraph 1-02 shall include any natural depressions or sloughs which may exist within the area where material is being wasted, and wasted material shall be so disposed of that any such natural drains will not be blocked. All wasted material shall be piled as high as the nature of the material will permit, in order to reduce to a minimum the restriction in flow within the pool area. The Contractor shall be responsible for making such additional explorations as are necessary to determine, in advance of stripping operations, the reaches where wasting of peat will be necessary, and the depth of the layer to be wasted. It is recognized that the thickness of the existing peat *192 cover will often vary between the front and the back of the borrow pit, and that it will not always be practicable to leave a layer of uniform thickness; compliance with the requirements of these specifications will be attained if the average thickness of remaining peat, across the borrow pit, is 3 feet. The number of explorations needed to determine the depth of peat to be wasted will vary but can be expected to amount to at least one auger boring for every 10,000 square feet of borrow area surface within the reaches where wasting of peat will be required. The approximate reaches within which wasting of peat is expected to be required, as indicated by explorations made to date, are listed below, but the limits for each reach will be determined by the Contracting Officer’s field representative, based upon all subsurface information finally available.
Station 35 to Station 140
Station 390 to Station 410
of Station 355
Station 435 to Station 500
Vicinity of Stations: 575,748, 770,1005,1110,1223, and 1233
The estimated quantity of peat to be wasted between Stations 7+45 and 1275 is 250 P00 cubic yards, which includes the volume of surface stripping on the borrow area in those reaches where stripping to a depth greater than one foot is directed in order to waste excess peat.
1-05 MEASUREMENT AND PAXMENT. -a. Excavation unclassified. 1. Payments for all work performed between Sta. 1275+00 and the north end of this contract, (approx Sta. 1386+31.31) will be made on the basis of quantities of material excavated from the borrow pit, including the peat wasted. Measurement of quantities to be paid for will be made by computing the volume between the natural ground surface, as shown by the last survey made before excavation, and the outline of the borrow pit after excavation is completed; from the volume so determined will be deducted the volume of any material above the plus tolerance limit specified in paragraph 1-03 above. Payment for the net volume of excavation determined as described above will be made at the contract unit price for “Excavation, unclassified” which price shall include all costs of clearing and stripping the levee foundation, constructing the levee, and placing the peat blanket as specified in paragraph 1-03c hereof.
2. In areas south of Sta. 1275+00 where wasting of excess peat is directed under the provisions of paragraph *193 1-045&. payment for all material wasted will be made at the contract unit price for “excavation, unclassified”. Measurement of such quantities will be made by computing the volume between the natural ground surface, as determined by the last survey made before work is performed, and the surface of the borrow pit after the peat has been wasted but before excavation for levee construction has been started.
b. Embankment. Payment for construction of levee between stations 7+45 and 1275 will be made on the basis of quantities of embankment placed. Measurements of quantities to be paid for will be made by_ computing the volume between the ground surface existing after stripping of levee base is completed, and the specified construction cross-section. The quantity of material so placed will be paid for at the contract unit price for “Embankment,” which price shall include the cost of clearing and stripping the levee base, stripping the borrow area except where such stripping is included in the removal of excess peat, constructing the levee and placing the peat blanket.
g. Partial payments. Partial payments will be made monthly on estimates of yardage removed. Only thirty (30) percent of the estimate will be allowed for removal of peat which is being wasted, and only ninety (90) percent of the estimate will be allowed in the case of material excavated and placed in the levee section where the levee is not completed to construction grade and cross-section. Quantities for partial payments may be based upon field estimates without the aid of a complete survey. In cases where the Contracting Officer considers it inadvisable to construct the embankment continuously to full grade and cross-section, partial payments on quantities excavated and placed in the levee will be made on the basis of the entire yardage so placed, in lieu of the ninety (90) percent referred to above.
7. The plaintiff received a notice to proceed on June 22, 1951. This fixed July 22, 1951, as the date on which the plaintiff was required to commence work under the contract.
8. (a) Subsequent to the signing of the contract, it was modified in two respects.
(b) Modification No. 1, in the form of a change order, was dated August 21,1951. That change was not significant from the standpoint of the present litigation.
(c) Modification No. 2, effected by a supplemental agreement dated March 14, 1952, provided for additional road *194 ramps and turnout to the levee berm and crown, with, resulting increases in the estimated quantities of the two contract pay items. By reason of this change, the estimated quantity of Item No. 1, “Excavation, unclassified,” was increased 1,500 cubic yards, and the estimated quantity of Item No. 2, “Embankment,” was increased 3,500 cubic yards. The total estimated contract consideration was adjusted upward at the applicable contract unit price per cubic yard on the increased quantities, or by $2,100.
9.Schedule I of the contract (see finding 4) was deleted as a result of Modification No. 2 (see finding 8(c)), and the following schedule was substituted for it:

Item Estimated Unit Estimated

No. Description Quantity Unit Price Amount

1 Excavation, unclassified_1,101, B00 Cu. yd. $0. 422 $464, 833. 00
2 Embankment_ 3,103, 500 Cu. yd. $0. 422 1, 309, 677. 00
10. The work was completed by the plaintiff and accepted by the Corps of Engineers on December 29,1952.
11. In constructing the northern section of the levee, and in removing from the borrow pit and wasting excess peat in the southern section, the plaintiff excavated 1,039,599 cubic yards of material from the borrow pit. (This figure does not include any material that was stripped from the levee base or from the surface of the borrow pit.) The Corps of Engineers paid the plaintiff for this work at the contract unit price of $0,422 per cubic yard for “Excavation, unclassified” (Item No. 1), or a total of $438,110.78. There is no controversy between the parties respecting this phase of the work or the sufficiency of this payment.
12. (a) In the southern section, after the levee base and the surface of the borrow pit had been stripped and the excess peat in the borrow pit had been removed and wasted, the plaintiff excavated from the borrow pit 4,798,058 cubic yards of material. A total of approximately 4,618,058 cubic yards of this material was placed by the plaintiff upon the prescribed levee site; and the remainder of the material (or approximately 180,000 cubic yards) was either spilled on the 40-foot strip of land separating the borrow pit from the levee site or was placed on the strip by the plaintiff to improve the working surface, and was not recovered by the plaintiff for placement as part of the levee. With the placement of the *195 4,618,058 cubic yards (approximately) of material upon the prescribed levee site, the peat comprising the ground surface of the levee base, as it existed upon the completion of the stripping operation, subsided beneath the weight of the added material and became inextricably mixed with it. The whole mass sank until it came to rest on the underlying sand, shell, and rock. This occurred during the construction of the levee and before it was measured for payment purposes.
(b) Of the total of approximately 4,618,058 cubic yards of material which the plaintiff placed upon the prescribed levee site in the southern section, approximately 1,288,617 cubic yards of the material either subsided (‘along with the ground surface of the levee base) below the line representing the elevation of the ground surface as it had existed after the stripping of the 'levee base and before the addition of material from the borrow pit, or disappeared in the form of shrinkage as the wet material dried out after being incorporated in the levee enbankment. This occurred during the construction of the levee and before it was measured for payment purposes. Neither the plaintiff nor the Corps of Engineers anticipated, at the time when the contract was made, that the subsidence and shrinkage would be of such magnitude and would occur so early in the life of the levee.
(c) As 1,000-foot segments of the levee in the southern section were completed by the plaintiff from time to time, such segments were surveyed by the plaintiff under the direction of the contracting officer (or his representative) in order that partial payments might be made by the defendant to the plaintiff. Each of these surveys related to the levee embankment lying above the line representing the elevation of the ground surface as it had existed after the stripping of the levee base and before the addition of the material from the borrow pit. The cubic yardage in each completed 1,000-foot segment above such line was computed by the Corps of Engineers, and a partial payment was made by the Corps of Engineers on that basis and accepted by the plaintiff.
(d) Measurement of the entire southern section of the levee upon completion revealed that the levee embankment, above the line representing the elevation of the ground sur *196 face as it had existed after the stripping of the levee base and before the addition of the material from the borrow pit, comprised a total of 3,329,441 cubic yards. This total included 99,005 cubic yards of overbuilding beyond the tolerance of 6 inches provided for in paragraph 1-03-a of Part IV of the specifications (see finding 6). The Corps of Engineers deducted the 99,005 cubic yards of overbuilding from the 3,329,441 cubic yards previously mentioned, multiplied the remainder of 3,230,436 cubic yards by the contract unit price of $0,422 per cubic yard for “Embankment” (Item No. 2), and thus computed that the plaintiff was entitled under paragraph 1-05-5 of Part IV of the specifications to a total of $1,363,243.99 for constructing the southern section of the levee. Payment of this amount has been made to the plaintiff, except for the sum of $35,600 assessed as liquidated damages (see finding 13), the sum of $100 withheld to keep the contract open pending the final disposition of the controversy mentioned in subsequent findings, and the sum of $1,354.23 withheld for laborers.[3]
13. As indicated in findings 11 and 12(d), the Corps of Engineers calculated that the plaintiff was entitled to payment for a grand total of 4,270,035 cubic yards of “Excavation, unclassified” (Item No. 1) and “Embankment” (Item No. 2). On this basis, the Corps of Engineers regarded July 4, 1952, as the date on which the plaintiff was required to complete all the work under the contract. Accordingly, the Corps of Engineers assessed against the plaintiff liquidated damages at the contract rate of $200 per day for 178 days of delay from July 5, 1952, to December 29, 1952, or a total of $35,600.
14. The final payment vouchers transmitted by the Corps of Engineers to the plaintiff were in the amounts of $142,-141.17 and $17,312.14, and were dated February 12, 1953. The plaintiff returned these vouchers, unsigned, to the District Engineer at Jacksonville, Florida, with a covering letter dated February 19, 1953. In this letter, the plaintiff stated (among other things) as follows:
We are not in agreement with the amount of the Vouchers, especially the penalty deduction of $35,600.00 *197 for 178 days delay. We are in tlie process of developing information which we believe will demonstrate this deduction is not warranted.
15. A letter dated February 27,1953, from the office of the District Engineer to the plaintiff stated in part as follows:
The liquidated damages * * * were assessed in accordance with the contract provisions. It is required that such damages be withheld as they accrue. These vouchers are returned herewith in event you wish to execute them under protest so that the sums covered may be paid to you without undue delay. Such action on your part will not prejudice your interests with respect to the issue involved.[4]
The information or data which you state you are preparing in this connection will be given careful consideration when submitted to this office.
18. (a) A detailed statement of the plaintiff’s position was set out in a 4-page letter, with enclosures, which the plaintiff wrote to the District Engineer under the date of April 17, 1953. With regard to the item of liquidated damages, the plaintiff contended (among other things) that, in view of the amount of material actually handled in the performance of the contract, the final date fixed under the provisions of the contract for the completion of the work was February 1, 1953, which was 32 days beyond December 29,1952, the actual completion date. The plaintiff requested “that an extension of time to February 1, 1953, be granted the Clemens Construction Company and the time of the contract be accordingly increased; and that the $35,600.00 withheld as liquidated damages be returned to the company.”
(b) The letter of April 17, 1953, also stated that “the information developed shows that considerable yardage was excavated and placed within the embankment profile that has not been considered for payment.” Such yardage was said to have been excavated and placed in the southern section of the levee, and to total 1,567,622 cubic yards. After explaining the plaintiff’s position with respect to this phase of the matter, the letter of April 17,1953, then stated that:
*198 Article 4 of the contract provides for “changed conditions”, and the information developed by the Company shows palinly [sic] that what happened is materially different from what was assumed or contemplated in the preparation of the specifications. * * *
17. The plaintiff’s claims were denied by the contracting officer in a letter decision dated May 6, 1953. This letter stated in part as follows:
* * * Payments for work under your contract have been made, and final payment will be made, on the basis of actual work performed in accordance with applicable provisions of the contract specifications and drawings. There were no errors of omission in the preparation of the specifications and no errors of commission in measuring the quantity of work actually performed. * * *
18. By means of a letter dated May 18,1953, the plaintiff responded to, and submitted a notice of appeal from, the contracting officer’s decision. In this letter, the plaintiff stated in part as follows:
* * * It cannot be denied that the extra yardage [1,567,622 cubic yards[5]] was excavated and it cannot be denied that extra time would be necessary to excavate this large amount of extra yardage and also it cannot be denied that this extra work will increase the contract completion time and that the extra time and work must be considered in establishing the contract time. To deny this is to be unrealistic.
H* «i*
* * * [I] n order that there will be no misunderstanding of what the Company claims, it will be resummarized:
(a) The Company requests an extension of the contract time to be consistent with the actual yardage handled * * *. The Company further requests, in mew of the extra yardage handled and the time to do the work, that assessed liquidated damages be remitted and the $35,600.00 retained by the Government be paid to the Company.
(b) The Company requests payment based upon a proper interpretation of the contract at the contract unit prices, for excavating from the borrow pit and *199 placing within the embankment profile an additional 1,567,622 on. yds. of material necessary to complete the levee over and above what the Government has stated it wdl pay for.
19. (a) On August 12, 1953, the successor contracting officer issued his final findings of fact and decision denying the plaintiff’s claims.
(b) The successor contracting officer stated (among other things) as follows with respect to the plaintiff’s claim for additional compensation in connection with the construction of the southern section of the levee:
It is the view of the Contracting Officer that if additional materials were placed in the embankment other than those disclosed by the Government survey that Same cannot be included as a p'ay item since the specifications provide that payment for all work shall be included in the items stated, and the specifications set forth how such will be measured (see Part IV of Specifications of Contract herebefore set forth in entirety), it being the obligation of the Contractor to keep all material within the cross section of the embankment to be measured if it wishes to be paid therefor. Any other construction would make it impossible to compute with any accuracy the quantity of materials the Contractor had placed in the embankment. * * *
(c) The successor contracting officer stated ('among other things) as follows relative to the question of liquidated damages:
* * * The time could not be computed until all the yardage had been handled and the work completed, since the completion time was based on such yardage, and likewise the number of days in excess of those permitted on which liquidated damages are charged could not be known in advance and was not known until the work was actually completed. The damages assessed were figured on the actual number of days over the contract limit determined by the quantity of materials handled, so obviously none of the things necessary to compute liquidated damages could be known until the work was fully performed.
20. The plaintiff duly appealed from the decision mentioned in finding 19 by means of a letter dated August 25, 1953.
*200 21. A bearing was held on March 2 and 3,1954, before the Corps of Engineers Claims and Appeals Board, acting for the head of the Department.
22. On May 6, 1955, the Corps of Engineers Claims and Appeals Board, by a 2-to-l decision, upheld the successor contracting officer’s findings and decision. The Board’s decision stated in part as follows:
* * * The work was divided into two segments * * *. This division was believed justified because of the fact that preliminary subsurface explorations (the results of which were made available to the appellant) indicated that the northern portion of the proposed levee * * * would rest on a less stable base than would the southern reach * * *. With regard to the southern sector, * * * where the amount of muck was not considered to be as great, the contract provided that the contractor would be entitled to both time and payment, based on the quantity of embankment placed. * * *
* $ # # *
* * * [B]ecause it had been determined that the amount of muck to be found in the southern section was not so great as to constitute a major problem to the contractor, the Government had decided to pay both time and money on the quantity of finished product only, and the specifications spell out that concept to the satisfaction of this Board. * * *
23. A motion by the plaintiff for reconsideration and rehearing was denied by the Corps of Engineers Claims and Appeals Board on May 6,1955.
24. On October 1, 1956, the plaintiff filed its petition in this court.
conclusión of law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover. Judgment will be entered to that effect. The amount of recovery will be determined pursuant to Eule 38 (c).

 The figures referred to In this sentence, and elsewhere in the report, as approximations represent estimates made on the basis of the evidence contained in the present record. If it shouldl be held that the plaintiff is entitled to recover, the parties will have an opportunity in the subsequent proceedings before the commissioner under Rule 38(c)i to develop and present data that are more precise concerning the amounts that are stated as approximations in this report.

 Two amendments to the specifications were Issued between tbe date of the Invitation and the date for the opening of bids (May 3, 1951). Neither of those amendments was significant from the standpoint of the present litigation.

 The Items of $100 and $1,354.23 are not Involved in the present litigation.

 The payments in the amounts of $142,141.17 and $17,312.14 were subsequently accepted by the plaintiff without prejudicing its right to demand additional compensation.

 This figure includes the 99,005 cubic yards of overbuilding, the 180,000 cubic yards (approximately)! of material left on the 40-foot strip between the borrow pit and the levee, and the 1,288,617 cubic yards (approximately) of material involved in the subsidence and shrinkage.